[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14999

_____

D.C. Docket No. 1:10-cv-00573-KD-M

DIANE G. MELECH,

Plaintiff - Appellant,

versus

LIFE INSURANCE COMPANY OF NORTH AMERICA,
THE HERTZ CORPORATION,
PENSION AND WELFARE PLAN ADMINISTRATION COMMITTEE,

Defendants - Appellees,

CIGNA CORPORATION, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

(January 6, 2014)

Before CARNES, Chief Judge, TJOFLAT, Circuit Judge, and EVANS,[*] District Judge.

TJOFLAT, Circuit Judge:

## I.A.

Diane Melech is the beneficiary of an employee welfare benefit plan provided by her employer Hertz. The plan includes a disability insurance policy (the "Policy") issued and administered by the Life Insurance Company of North America ("LINA"). LINA's administration of the Policy is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, 29 U.S.C. §§ 1001–1461. Melech stopped working at Hertz in May 2007, when her treating orthopedist took her off work on account of his diagnoses of degenerative disc disease in her cervical spine and tendonitis in her right shoulder.[1] Melech submitted a claim for long-term disability benefits under the Policy in October 2007. At LINA's direction, she also applied for Social Security Disability Income ("SSDI") that same month.

LINA denied Melech's claim in November 2007, while her SSDI application was still pending before the Social Security Administration ("SSA"). Melech

---

[*] Honorable Orinda D. Evans, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] Melech was a station manager at one of Hertz's car-rental locations. She described her daily activities as renting cars to customers, filling out paperwork, managing employees' schedules, and occasionally cleaning and prepping cars. Melech claimed that persistent pain in her neck and shoulder made her unable to perform these duties.

2

appealed the denial of her claim through LINA's administrative process. Meanwhile, in December 2007, the SSA asked Melech to visit two new physicians for an independent assessment of her condition. The SSA granted Melech's application for disability benefits in February 2008, and Melech so informed LINA. LINA then went on to deny two consecutive administrative appeals without considering or even asking Melech for the SSA's decision, the two SSA physicians' assessments, or any other evidence before the SSA.

## B.

Melech brought this ERISA action in October 2010, claiming that LINA violated the Policy's terms and ERISA's requirements—in part because LINA ignored the SSA process and the information it generated. The District Court granted summary judgment in favor of LINA because it concluded that LINA's ultimate decision to deny benefits under the Policy was correct based on the administrative record in LINA's possession at the time it made its decision—a record that did not contain any information related to Melech's SSDI application. Melech now appeals to this court.

Today, we do not judge the propriety of LINA's ultimate decision to deny Melech's claim for benefits under the Policy because we hold that LINA had an obligation to consider the evidence presented to the SSA. Thus, because LINA did not have this evidence when it denied her last appeal—and in fact could not have

3

had that evidence when it initially denied her claim—we vacate the District Court's judgment and remand the case with instructions to remand Melech's claim to LINA for its consideration of the evidence presented to the SSA.

## II.

The crux of our holding lies in the relationship between LINA's claim-evaluation process and the parallel SSA process.  LINA's Policy effectively requires claimants who apply for benefits under the Policy to also apply for disability benefits from the SSA.  LINA is then allowed to reduce the benefits it pays, if any, to account for a claimant's receipt of these SSA benefits.  At the outset, we presume that LINA's interactions with all claimants are the same: LINA shepherds them into the SSA process in anticipation of the possibility that it might have to pay benefits.  But a divergence arises in LINA's interest in its claimants' SSA applications in cases where LINA finishes its evaluation of the claim before the SSA reaches a decision on the SSDI application.  The SSA deduction only remains relevant to LINA if LINA decides that the claimant is eligible for benefits under the Policy.  In these situations, LINA exercises its rights under the Policy to insert itself into the SSA process in an attempt to influence the outcome to protect LINA's SSDI deduction.  Conversely, in Melech's case, LINA initially sent her to the SSA but then decided that she was not eligible for benefits under the Policy.

4

Because it no longer needed to protect its SSDI deduction, LINA ignored the status of Melech's SSDI application and the SSA's eventual decision to award benefits.

Importantly, the SSA process produces more than just a final sum of money—it also may produce additional evidence that is relevant to the claimant's physical condition and vocational capacity. The question we address in part C below is whether LINA is free to selectively use the results of the SSA process only to the extent that it serves LINA's interest to do so. We begin by first explaining in detail the Policy terms that relate to LINA's rights to monitor and participate in the SSA process when it has a financial stake in the outcome. Then, we turn to LINA's disregard for the SSA process when it does not have any skin in the game, which we illustrate by explaining LINA's evaluation of Melech's claim.

**A.**

To receive long-term disability benefits under the Policy, a claimant has the burden of producing evidence to show that she can no longer perform the material duties of her "Regular Occupation" as a result of injury or sickness and cannot otherwise earn 80 percent of her previous earnings. To continue receiving benefits after twenty-four months, the claimant must show that she cannot perform any occupation that she "is, or may reasonably become, qualified [for] based on education, training or experience" and cannot earn 60 percent of her previous earnings. Record, no. 112-2, at 118. If a claimant meets this burden of proof,

5

LINA is obligated to pay disability benefits in proportion to the claimant's salary at the time she became disabled.

These benefits paid out under the Policy are subject to a deduction for the amount of "Other Income Benefits" that the claimant receives because of her disability. Other Income Benefits includes Social Security Disability Income ("SSDI") that the claimant actually receives, or is "assumed to receive." By default, if the claimant is not actually receiving other benefits, LINA will nonetheless "assume the [claimant] . . . [is] receiving benefits for which they are eligible" and will "reduce the [claimant's] Disability Benefits by the amount of Other Income Benefits it estimates are payable to the [claimant]." Record, no. 112-2, at 126. According to LINA's claims manual, it uses a spreadsheet tool to determine claimants' eligibility for SSDI and to estimate the amount that the SSA would award. The spreadsheet itself is not part of the record before us, but we note that the eligibility determination and estimate of "assumed" benefits requires LINA to step into the SSA's shoes to determine what medical and vocational evidence would be available to the SSA and then evaluate that evidence using the SSA's separate rules for granting disability benefits.[2]

---

[2] For purposes of SSDI, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" that is "of such severity that [the applicant] is not only unable to do his previous

6

The need to deduct "assumed" SSDI only comes into play in those cases where LINA decides to pay benefits under the Policy, but the claimant has not yet been awarded SSDI—either because the SSA has not reached a final determination or because the claimant did not apply in the first place. If the claimant did not apply, LINA may immediately deduct assumed SSDI from its payments to the claimant. If the SSA is still considering the claimant's application, LINA will delay the assumed-benefits deduction until the SSA process has run its course, so long as the claimant promises to reimburse LINA for any "overpaid" benefits in the event that the she later receives retroactive SSDI that overlaps with LINA's payments under the Policy. While LINA waits for the SSA to reach a decision, LINA's claim managers are expected to monitor the status of the claimant's application by periodically asking the claimant for information on her SSDI application. If the SSA eventually grants the application, then LINA will deduct the actual amount of the award from any future benefits paid under the Policy and the claimant will reimburse LINA for any past benefits that LINA overpaid. If the

---

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(1)(A), (d)(3). The SSA's determination regarding applicants' eligibility for SSDI is governed by procedural rules promulgated by the Commissioner of Social Security. See, e.g., 20 C.F.R. Part 404, Subpart J.

SSA denies the application, LINA may require the claimant to take an appeal "if it believes a reversal . . . is possible."

The SSDI process has three levels of administrative appeals from an initial denial: reconsideration by a new SSA examiner, a hearing before an administrative law judge, and an appeal to the Social Security Appeals Council. 20 C.F.R. § 404.900(a). If an applicant exhausts those options without obtaining a favorable result, she may file suit in federal court. 42 U.S.C. § 405(g). LINA's claims manual directs its claim managers to automatically require claimants to take appeals as far as the Appeals Council; beyond that, claim managers are to refer the claim to a "Technical Consultant." The record does not indicate what a technical consultant does with the claim, but we note that the terms of the Policy allow LINA to make claimants take "all appeals" that LINA deems "likely to succeed." If the claimant does not cooperate with LINA's appeal requests, LINA may deduct assumed SSDI. Only if the claimant exhausts her appeals to LINA's satisfaction without obtaining a favorable outcome will LINA waive the SSDI deduction.

The Policy also authorizes LINA to assist claimants in navigating the SSA process, and LINA has a Social Security Assistance Program ("SSAP"), which is administered by a handful of third-party vendors, to help its claimants obtain SSDI. LINA refers most claimants to one of its SSAP vendors shortly after they file their claim with LINA—though a claimant can opt to pursue SSDI on her own. LINA's

8

disclosure authorization form, which authorizes it to obtain information directly from the claimant's physicians, employer, etc., also authorizes LINA to share the claimant's information with these vendors. LINA's claim managers are instructed to transfer a claimant's medical information to a vendor upon referring the claimant to that vendor, ostensibly so the vendor can then use that information to help the claimant obtain SSDI. If a claimant refuses to cooperate with the vendor, or if she pursues SSDI on her own and does not provide LINA with the documentation it asks for in relation to her application, LINA may deduct assumed SSDI.

To summarize, the Policy effectively requires all claimants to apply for SSDI at the outset; if a claimant fails to do so, LINA can reduce her benefits under the Policy, if any, by the amount of SSDI LINA says she could have gotten. In the event that LINA decides to pay a claim, the Policy allows LINA to hold the claim open, at least with respect to the total amount LINA must pay, until the SSA reaches a final decision. LINA may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that LINA gathered to LINA's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, LINA can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from LINA's perspective because—

9

having decided to pay the claim—every dollar the claimant gets from the SSA is one less dollar LINA has to pay.

## B.

Next, we turn to the alternative scenario, present in Melech's case, where LINA has initially determined not to pay benefits under the Policy and therefore does not have a financial interest in the claimant's SSDI award.

When Melech filed her claim for disability benefits in October 2007, LINA sent her a letter describing the claim-evaluation process and what LINA needed from her. LINA explained the Policy terms (described above) that allow it to deduct SSDI from any benefits she might receive under the Policy. LINA also provided an information sheet describing the advantages of applying for SSA disability benefits, offered to help Melech apply, and asked her to help them "keep our file up-to-date with regard to your Social Security claim."[3]  Record, No. 112-2, at 83–85. LINA enclosed its reimbursement agreement and disclosure authorization form for Melech to sign—which she did. The reimbursement agreement obligated Melech to pay LINA back for any benefits LINA might overpay in light of a retroactive SSDI award and also required her to "provide any

---

[3] Per LINA's claims manual, when Melech called LINA to initiate her claim, LINA's representative also should have given Melech information about the SSDI process and LINA's Social Security Assistance Program and explained LINA's right to deduct SSDI based on Melech's actual or assumed receipt of those benefits. **[Doc 143-4 at 107]**

information about my [SSDI] claim needed to determine the benefits I am entitled to under the [Policy]" and to keep LINA "apprised of the progress of my claim for [SSDI]." Record, no. 112-2, at 333. The disclosure authorization form allowed LINA to obtain information related to Melech's claim directly from a wide number of entities, including her doctors, employer, and the SSA, and to share that information with LINA's SSAP vendors.[4]

As any rational policyholder would do in her situation, Melech applied for SSDI in October 2007 and informed LINA shortly thereafter. In mid-November, LINA referred Melech's case to Advantage 2000 Consultants—one of LINA's SSAP vendors—so that Advantage could contact Melech and assist her in navigating the SSDI application process.[5] But then, on November 29, 2007, LINA denied Melech's claim because, based on the evidence it had gathered from Melech's physicians, LINA believed that she was still able to perform her job at Hertz.[6] LINA's denial was made according to the timeline called for under the

---

[4] The form authorized LINA to obtain "any information or records . . . concerning me, my occupation, my activities, employee/employment records, earnings or finances, applications for insurance coverage, prior claim files and claim history, work history and work related activities" from "any . . . governmental agency including the Social Security Administration." Record, no. 112-2, at 332.

[5] The record does not include any communication between Advantage and Melech.

[6] The medical evidence in LINA's possession at this point included (i) a disability questionnaire filled out by Melech, which reflected her ability to complete daily living activities; (ii) notes from Melech's visits to her treating orthopedist Dr. Edmund Dyas; (iii) an MRI of Melech's cervical spine; (iv) a letter from Dr. Dyas indicating that Melech was "permanently and

Policy, but it came before the SSA had reached a determination on Melech's application.

Meanwhile, in December 2007, the SSA asked Melech to visit two physicians—J.M. Jackson, PsyD, and Eugene Bass, MD—for an independent assessment of her condition. Based on Drs. Jackson's and Bass's reports, along with the information the SSA gathered from Melech's treating physicians, the SSA approved Melech's application on February 16, 2008.[7]

Melech appealed LINA's initial denial on January 31, 2008—shortly before the SSA granted her SSDI application. After the SSA granted her application, Melech informed LINA that she was receiving SSDI and that the SSA had referred her to additional doctors for an independent assessment.[8] LINA denied her appeal in April 2008 without asking Melech or the SSA for the SSA doctors' reports or

---

totally disabled"; (v) records of Melech's physical therapy sessions at Fleming Rehab and Sports Medicine; (vi) notes from Melech's visit to Dr. Todd Engerson, an orthopedist that Hertz sent Melech to for a second opinion on her condition; and (vii) notes from Melech's visit to Dr. Jonathan Miller, an internal medicine doctor at a clinic Melech visited for abdominal pain (unrelated to her disability claim). LINA explained in its letter denying Melech's claim that, upon review of this evidence, it was "unable to validate medical documentation which support[s] your inability to perform the material duties of your Regular Occupation." Record, no. 112-2, at 174.

[7] The body of evidence compiled by the SSA (aside from Drs. Jackson and Bass) was largely coterminous with the evidence in LINA's administrative record, though the SSA gathered evidence from some physicians that treated Melech for conditions unrelated to her neck and shoulder pain.

[8] LINA's claims manual directs claim managers to request the SSA's award letter upon notification that a claimant has been awarded SSDI. The record does not indicate that LINA requested Melech's award letter from Melech or the SSA.

12

any other evidence gathered during the SSA investigation.[9]  In October 2008, Melech took a second appeal at LINA's invitation and again informed LINA that she was receiving SSA benefits.  She also provided LINA with Drs. Jackson's and Bass's names and asked LINA to explain why it had reached a different decision than the SSA.  Approximately one week later, LINA denied her second appeal. LINA never asked Melech or the SSA for any of the evidence generated during the SSA's investigation.[10]  In response to Melech's question about the SSA's decision, LINA explained that "Social Security Disability decisions are independent of our decision."  Record, no. 112-2, at 140.  LINA gave Melech another forty-five days to submit additional medical documentation.

Melech did not accept LINA's invitation to submit more evidence and filed this ERISA action in October 2010, alleging that LINA violated the terms of the policy and ERISA's requirements when it denied her claim.  See 29 U.S.C.

---

[9] In LINA's first letter denying Melech's claim and inviting her to appeal, LINA advised Melech to provide "any medical evidence which supports your total disability" during the appeal. Record, no. 112-2, at 175.  In a follow-up letter during Melech's first appeal, LINA prompted her to submit "all available medical or other documentation related to your claim."  Record, no. 112-2, at 166.  During the first appeal, Melech submitted notes from a new visit to Dr. Dyas, her treating orthopedist, and a second letter from Dr. Dyas indicating that she was unable to work because of her physical condition.

[10] In LINA's letter inviting Melech to take a second appeal, it asked her to submit "new documentation" including "copies of office notes, test results, physical examination reports, mental status reports, consultation reports, or any other pertinent medical information from May 2007 to the present."  Record, no. 112-2, at 158.  During her second appeal, Melech gave LINA Dr. Dyas's notes from another visit, new MRIs of her neck and right shoulder, and records from a therapist and psychiatrist that she began seeing just before her second appeal.

13

§ 1132(a)(1)(B).  After discovery, LINA filed a motion for summary judgment, claiming that Melech had not produced evidence to show that its decision to deny her disability claim—based on the record in LINA's possession at the time it made that decision—was incorrect.[11]  In opposition to LINA's motion for summary judgment, Melech provided the District Court with the file that the SSA had compiled while processing her application.  The SSA file included medical records that the SSA gathered from Melech's treating physicians, the independent assessments made by Drs. Jackson and Bass, the SSA's internal assessments of this medical evidence, and the SSA's notice letter granting Melech's application.  LINA moved to strike the entire SSA file because Melech had not submitted any of the documents to LINA during the pendency of her claim.  It explained:

> [T]he SSDI opinion, much less the complete SSA file, was not available to or reviewed by LINA during the pendency of Plaintiff's claim.
>
> LINA, by no fault of its own, simply does not know what evidence was before the SSA when it made its decision since the SSDI opinion is not part of this claims file. . . . . As the SSA likely had different evidence before it when it made its decision . . . it is even more imperative that this Court not take the SSA medical records into account when evaluating the reasonableness of LINA's decision based on the record before it.

---

[11] When reviewing a claim administrator's denial of benefits under an ERISA plan, courts first determine de novo whether the administrator's decision was correct, based on the evidence the administrator had at the time.  Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011).

14

Record, no. 151, at 4. The District Court agreed that its review of LINA's decision was limited to the administrative record before LINA at the time it made its final decision to deny Melech's claim, and so the District Court did not consider the SSA file in reaching its conclusion that LINA's decision was correct.

On Melech's appeal to this court, LINA maintains that it only had an obligation to evaluate information related to the SSA's determination if Melech submitted that evidence during the pendency of her claim. And so, "[s]ince Plaintiff failed to present available evidence to LINA during the claim's adjudication process, she cannot now fault LINA, or the District Court, for failing to consider such evidence." LINA Brief, at 35.

Based on these actions and representations, it appears that Melech's SSDI application became irrelevant to LINA—or at least no more relevant than any other evidence in Melech's possession—once it initially decided to deny her claim for benefits under the Policy in November 2007. When LINA initially denied Melech's claim, it knew that her SSDI application was still pending. The clear inference from the timing of this initial denial is that LINA's decision would have been the same, regardless of what the SSA decided or what information came out

15

of the SSA investigation.[12]  In considering Melech's appeals, LINA did nothing to

contradict the implication that Melech's SSDI application was irrelevant to her

claim for benefits under the Policy.  LINA made general requests for more

evidence, but never asked Melech or the SSA—at it was authorized to do by the

disclosure authorization form—for any documentation of her SSDI award or any of

the evidence that the SSA considered in approving her application, notwithstanding

the fact that Melech kept LINA in the loop as requested.  And in the letter denying

her second administrative appeal, LINA told Melech in one paragraph that the

SSDI process was independent of its own, and in the next that she was free to

provide LINA with additional relevant evidence of her disability—the implication

being that the information related to her receipt of SSDI was not relevant to

LINA's inquiry.[13]  In sum, once LINA made the initial determination to deny

Melech's claim in November 2007, it lost interested in her SSDI application.

---

[12] ERISA regulations require an administrator to notify claimants of an adverse initial decision within 45 days of receiving the claim, but the administrator can delay a decision for up to 60 more days if, due to matters outside of the administrator's control, it cannot render a decision within the 45-day window.  29 C.F.R. § 2560.503-1(f)(3).  If the reason the administrator cannot render a decision is because the claimant has not provided the administrator with the evidence it needs to do so, then the regulatory time limit is tolled until the claimant has produced the needed evidence.  Id. § 2560.503-1(f)(4).  LINA's initial denial came 58 days after Melech filed her claim; it did not use the full amount of time available under the ERISA regulations to wait for an SSA decision.

[13] Even if LINA only meant to explain that the SSA uses different standards for granting disability—thus making its decision to grant Melech's SSDI application of little moment to her claim for benefits under the Policy—when this statement is viewed in light of LINA's earlier denial (before the SSA reached a decision), it would have been reasonable for Melech to

16

C.

The question we address, then, is whether LINA was free to ignore the results of the SSA process once it initially determined that Melech had not provided enough evidence to support her claim for benefits under the Policy. We conclude that LINA should have considered the evidence generated by the SSA process, but before explaining that conclusion in detail, we first explain where our evaluation today fits into our standard of review under ERISA.

Courts of appeal review a district court's grant of summary judgment in an ERISA case de novo, applying the same judicial standard to the administrator's decision that the district court used to guide its review. Blankenship, 644 F.3d at 1354. While ERISA and the Secretary of Labor's regulations provide certain minimum procedural requirements, the statute and regulations do not provide a judicial standard of review for courts reviewing administrators' benefit-eligibility decisions. See 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1. Drawing on traditional principles of trust law, the Supreme Court articulated a framework for judicial

conclude that LINA did not want any information related to her SSDI application. See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) (explaining that courts will interpret policy terms and descriptions of those terms "from the perspective of an average plan participant").

17

review, which this circuit has distilled into a six-part test.[14]  See Firestone Tire &

Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956–57 (1989); Williams

v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).  Under our

Williams test, courts first review the administrator's decision de novo for

correctness: based on the evidence before the administrator at the time it made its

decision, the court evaluates whether it would have reached the same decision.

Blankenship, 644 F.3d at 1354–55.  If the decision is correct, the court goes no

further and grants judgment in favor of the administrator.  Id.

---

[14] The six-part test, as modified by our decision in Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1359–60 (11th Cir. 2008), is as follows:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355 (citation omitted).  The phrase "arbitrary and capricious" and "abuse of discretion" are used interchangeably.  Id. at 1355 n.5.

18

The District Court here concluded, under Williams's first step, that LINA's decision was correct based on LINA's administrative record at the time it denied Melech's claim; as explained above, the administrative record did not contain the SSA file that Melech produced at trial. The District Court did not address the separate, normative, question of whether LINA should have considered the information contained in the SSA file. As a matter of common sense, we cannot evaluate LINA's ultimate decision to deny Melech's claim without first considering whether the record LINA had before it was complete. See Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989) (explaining that courts should not make benefit-eligibility determinations under ERISA plans based on evidence that the administrator did not consider). This inquiry is not as much a Williams "step zero" as it is a predicate to our ability to review the substantive decision we have been asked to review. Cf. Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996) (explaining that when reviewing executive agencies' decisions, "if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S. Ct. 1598, 1607 (1985))). Thus, before

19

deciding whether LINA was correct when it denied Melech's claim for benefits under the Policy, we must first determine whether LINA should have considered the information contained in her SSA file.

To answer this question, we begin with the foundational observation that Melech had the burden of proving her entitlement to disability benefits under the Policy.[15]  This burden included the obligation to provide LINA with medical evidence to support a finding that she was "disabled," as defined by the Policy.[16] Because she bore the burden of proof, if Melech did not provide LINA with all available medical evidence to support her claim, she bore the risk of having her claim denied if the (incomplete) body of evidence before LINA did not support a disability finding.  See Blankenship, 644 F.3d at 1354 ("[Judicial] [r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision.").  While ERISA required LINA to explain its reasons for denying Melech's claim and give her the opportunity for a "full and fair review" of that denial, neither ERISA nor the Policy

---

[15] The Policy requires claimants to "provide the Insurance Company, at his or her own expense, [with] satisfactory proof of Disability before benefits will be paid."  Record, no. 112-2, at 125.

[16] Proof of disability is based on, "[1] medical evidence submitted by the Employee; [2] consultation with the Employee's Physician; and [3] evaluation of the Employee's ability to work by . . . Independent Experts if required by [LINA]."  Record, no. 112-2, at 118.

20

required LINA to ferret out evidence in Melech's or the SSA's possession.[17]  See 29 U.S.C. § 1133; Jett, 890 F.2d at 1139–40.

Notwithstanding the normal operation of this burden of proof, the Policy terms that required Melech to apply for SSDI and LINA's seemingly self-interested disregard for her SSDI application give us pause.  We find nothing necessarily troubling in the terms of LINA's Policy that allow it to benefit from the SSA's alternative compensation mechanism.  Nor do we take issue with the lengths LINA has gone to to ensure that its claimants apply for SSDI, or even LINA's right to second guess an SSA denial.  However, in light of these openly self-interested efforts, we are troubled by the implication of LINA's actions in Melech's case, where it ignored her SSDI application and the evidence generated by the SSA's investigation once it no longer had a financial stake in the outcome.

First, we note that LINA's role in its claimants' SSDI applications is not one of a mere passive observer.  LINA does not simply plug whatever number the SSA spits out into its own calculations.  Instead, it tries to actively influence the

---

[17]  ERISA regulations required LINA to notify Melech of "any additional material or information necessary for [Melech] to perfect [her] claim and [provide] an explanation of why such material or information is necessary."  29 C.F.R. § 2560.503-1(g)(1)(iii).  We question whether LINA satisfied this requirement in deciding Melech's final administrative appeal without specifically asking her for any information in her SSA file—particularly because Melech informed LINA of the SSA award and gave LINA the names of the two doctors the SSA sent her to.  Because we remand Melech's claim to LINA for its consideration of the SSA evidence, any procedural defect that might have been created by LINA's failure to ask for the SSA documents is cured.

outcome and even reserves the right to second guess the SSA and step into the agency's shoes to determine what it might have done. To estimate the amount of "assumed" SSDI that a claimant could have received, LINA must necessarily determine what evidence the SSA would have considered when making that determination and how it would weigh that evidence in reaching an outcome. Alternatively, if a claimant engages the SSA process, LINA may attempt to maximize its own deduction by arranging for a third party to help the claimant prove her disability to the SSA and by making the claimant's medical information available for use in the SSA proceedings. Even then, LINA can second guess an adverse SSA decision and require the claimant to take an appeal. To evaluate whether the SSA was wrong when it denied an application and whether an appeal would result in a reversal of that decision, LINA would have to know what evidence the SSA had before it when it denied the application. Because LINA's disclosure authorization form allows it to obtain information directly from the SSA, and because LINA's policies allow it to deduct "assumed" SSDI if a claimant does not cooperate with LINA's requests for information, any documentation LINA needs regarding its claimants' SSDI applications is available upon request.

Yet, once LINA decided at first blush that Melech had not provided enough medical evidence to support her claim, it treated the SSA process and the evidence generated by it as irrelevant and unavailable. This treatment is internally

22

inconsistent with LINA's mode of evaluating claims. If LINA had been inclined to pay Melech's claim, it would have withheld its own determination regarding the amount of benefits due until the SSA reached a decision on her SSDI application—in the process, potentially requiring Melech to pursue administrative appeals. As explained above, this process would have allowed LINA to consider the evidence in the SSA's possession. But because LINA was initially inclined to deny her claim based on the evidence available to it at the time, LINA did not wait for the conclusion of the SSA process, notwithstanding the fact that the evidence generated by the SSA's investigation might prove useful in determining whether Melech was eligible for benefits under the Policy.

As LINA explained in its appellate brief and its motion to strike in the District Court, because of the SSA's distinct evidentiary rules and administrative process, the SSA investigation was likely to generate different evidence than LINA's own evaluation—and in fact it did, because the SSA sent Melech to Drs. Jackson and Bass. This medical evidence is certainly relevant to LINA's determination regarding Melech's ability to perform her Hertz job or some other job, even if the SSA's ultimate conclusion is distinguishable on account of the

23

distinct SSA rules for granting SSDI.[18]  It is not difficult to imagine a close case where the initial evidence available to LINA is insufficient to establish the claimant's eligibility for benefits under the Policy, but the additional evidence generated by the SSA process is enough to change the preliminary result.  Even if the SSA evidence does not change the result, it would still lead to a more informed decision to deny benefits under the Policy.[19]

In Melech's case, LINA refused to wait for the SSA evidence, even though it could have relied on that same evidence to protect its SSDI deduction had it decided to pay Melech's claim.  LINA is not free to selectively use evidence in this manner.  If LINA had sent Melech to another doctor for an independent evaluation, it could not have ignored the doctor's opinion simply because it did not serve LINA's interests.  Similarly, having sent Melech to the SSA to seek alternative compensation, LINA was not free to ignore the evidence generated by the SSA

---

[18] For example, the SSA is required to give special weight to the opinions of treating physicians, whereas ERISA claim administrators are not.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825, 123 S. Ct. 1965, 1967 (2003).

[19] Given the obvious usefulness of the evidence generated during the SSA's inquiry into Melech's physical condition and vocational capacity, Melech could have reasonably interpreted LINA's request that she keep LINA up to date on her SSDI application to mean that LINA wanted the benefit of this evidence when making its own determination.  While we do not rely principally on this representation in reaching our conclusion today, we note that this court has long interpreted representations regarding claimants' requirements under an insurance policy from the perspective of the claimant.  See Watts, 316 F.3d at 1207–08.

24

process as soon as it no longer had a financial stake in the amount of money the SSA decided to award.

Other circuits have grappled with the question of what to do with the specter of procedural unreasonableness that arises from facts like these. Most courts have confronted some variation of the question when reviewing the merits of an administrator's denial under an abuse of discretion standard.[20] These courts have generally relied on the inconsistency between an administrator's policies encouraging its claimants to apply for SSDI (for the administrator's financial benefit), and the administrator's subsequent denial of benefits under the ERISA plan, to support the court's decision to reverse the administrator's denial of benefits.[21] See, e.g., Glenn v. Metro. Life Ins. Co., 461 F.3d 660, 666–669 (6th

---

[20] While other circuits do not use the same six-part test that the Eleventh Circuit employs, they all apply some variation of the Supreme Court's Firestone framework: They first evaluate the administrator's decision de novo; if the court does not agree with the decision, but the underlying policy gives the administrator discretion in making eligibility determinations, they determine whether the administrator abused that discretion. Cf. Firestone, 489 U.S. at 115, 109 S. Ct. at 956–57.

[21] The prevailing line of reasoning is based on administrators' failure to adequately distinguish their own decisions from the SSA's; this approach is encapsulated in the following excerpt from a Sixth Circuit case:

A determination that a person meets the Social Security Administration's uniform standards for disability benefits does not make her automatically entitled to benefits under an ERISA plan, since the plan's disability criteria may differ from the Social Security Administration's. Nonetheless, the Social Security Administration's decision is far from meaningless. Although there is no technical requirement to explicitly distinguish a favorable Social Security determination in every case, [i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's

25

Cir. 2006), *aff'd on other grounds by* 554 U.S. 105, 128 S. Ct. 2343 (2008); Ladd

v. ITT Corp., 148 F.3d 753, 756 (7th Cir. 1998) (Posner, J.); Montour v. Hartford

Life & Accident Ins. Co., 588 F.3d 623, 635–37 (9th Cir. 2009).

We are similarly struck by the procedural unfairness created by LINA's

approach.  We conclude that LINA's treatment of Melech's SSA application is

inconsistent with the fundamental requirement that an administrator's decision to

deny benefits must be based on a complete administrative record that is the product

of a fair claim-evaluation process.  Because LINA's decision to deny benefits here

was based on an administrative record that did not contain the information from

Melech's SSA file, the proper course of action is to remand Melech's claim to

LINA rather than to evaluate the merits of Melech's claim for benefits under the

---

receipt of Social Security; and then (3) fails to explain why it is taking a position
different from the SSA on the question of disability, the reviewing court should
weigh this in favor of a finding that the decision was arbitrary and capricious.

DeLisle v. Sun Life Assur. Co. of Can., 558 F.3d 440, 445–46 (6th Cir. 2009) (alteration in
original) (citations omitted) (internal quotation marks omitted).

As an alternative conceptual approach towards the same end, Judge Posner has invoked
the doctrine of judicial estoppel to enforce a "modicum of consistency" on an administrator's
position regarding its claimants' disability status.  Ladd v. ITT Corp., 148 F.3d 753, 756 (7th Cir.
1998).  While recognizing that the doctrine is not technically applicable where the administrator
did not participate in the parallel SSA proceedings, Judge Posner would nonetheless view an
administrator's conclusion that a claimant is not disabled more skeptically if the administrator
had previously urged the same claimant to make the opposite argument to the SSA.  Id.

We cite these decisions to support our conclusion that LINA's denial of benefits under
the Policy without considering the evidence from the SSA process raises questions of procedural
fairness.  We do not imply that the SSA's ultimate conclusion that Melech was "disabled" under
the SSA standard creates a presumption that she is eligible for benefits under the Policy.

26

Policy using evidence that LINA did not consider.  See Levinson v. Reliance

Standard Life Ins. Co., 245 F.3d 1321, 1330 (11th Cir. 2001) ("[A]s a general rule,

remand to the plan fiduciary is the appropriate remedy when the plan administrator

has not had an opportunity to consider evidence on an issue.") (citing Jett, 890 F.2d

at 1140)).

Therefore, we vacate the District Court's grant of summary judgment in

favor of LINA and remand to the District Court with instructions to remand the

matter to LINA.  In doing so, we do not pre-judge the ultimate outcome.  LINA

may be able to draw a principled distinction between its own standards for granting

disability benefits under the Policy and the SSA's standards for awarding SSDI.

All we require of LINA is to decide Melech's claim with the full benefit of the

results generated by the SSA process that it helped to set in motion. [22]

VACATED AND REMANDED.

---

[22] Melech also contends that the District Court abused its discretion when it, by implication, denied her motion to unseal documents that LINA had designated as confidential. Cf. Local 472 v. Georgia Power Co., 684 F.2d 721, 724 (11th Cir. 1982) ("In light of the District Court's grant of summary judgment in favor of the defendants, we interpret the Court's silence regarding these [discovery] motions as a denial.").  In her motion asking the District Court to unseal the documents, Melech included as Exhibit B a letter written by LINA's counsel detailing the reasons the documents should remain sealed.  In light of the reasons listed in that letter, which Melech does not tackle head-on in her briefs to this court, we cannot say that the District Court abused its discretion by impliedly denying her motion.  We leave to the District Court's discretion on remand the determination of whether it will reconsider Melech's request to unseal these documents.

EVANS, Judge, dissenting:

I respectfully dissent.  I agree with the majority that an ERISA plan administrator's decision to deny disability benefits without reviewing medical reports in the possession of the Social Security Administration could lead to incongruous or arguably inequitable results.  However, on the facts of this case, I would hold simply that the district court's decision was de novo correct and that the arguments Melech makes regarding procedural unfairness are without merit.

LINA did comply with all ERISA regulations, including notifying Melech of "any additional material or information necessary for [Melech] to perfect [her] claim and [provide] an explanation of why such material or information is necessary."  29 C.F.R. § 2560.503-1(g)(1)(iii).  Specifically, LINA informed Melech in writing that she should submit medical documentation to support her appeal, which "includes, but is not limited to: copies of office notes, test results, physical examination reports, mental status reports, consultation reports, or any other pertinent medical information."  Record, no. 112-2, at 74.  This admonition was repeated in LINA's response to Melech's letter of October 10, 2008, which stated she had been granted Social Security disability benefits and that this decision had been based in part on seeing Drs. Jackson and Bass.  LINA's response granted Melech an additional 45 days within which to file new medical documentation and file a second appeal request.  LINA could not have

28

independently obtained the Jackson and Bass opinions from the Social Security Administration.

The district court correctly ruled that it would not consider any materials which were not before the plan administrator at the time it made its decision to deny benefits. The district court's decision meticulously considered all the evidence which had been before the plan administrator and affirmed the plan administrator's decision. While the majority's opinion explicitly says "neither ERISA nor the Policy required LINA to ferret out evidence in Melech's or the SSA's possession," I think that will be the perceived message of the majority opinion. I am concerned that the majority opinion promotes uncertainty in the already confusing law which surrounds ERISA disability cases.