[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15586
Non-Argument Calendar
_____

D.C. Docket No. 8:15-cv-00716-JSM-EAJ


RASSEKH SOBH,

                                        Plaintiff - Appellant,

versus

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,
a Foreign Corporation,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 1, 2016)

Before HULL, MARCUS, and ROSENBAUM, Circuit Judges.

PER CURIAM:

This is an appeal from the entry of summary judgment in an action for long-term disability benefits pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  Plaintiff-Appellant Rassekh Sobh brought suit in the district court to obtain reversal of Defendant-Appellee Hartford Life and Accident Insurance Company's ("Hartford") decision, as a claim administrator for an employee welfare benefit plan, to discontinue benefits.  After consideration, we affirm the district court's entry of summary judgment in favor of Hartford.

## I.

Sobh worked for JPMorgan Chase Bank ("Chase") as a Technical Operations Lead and had long-term disability coverage as a participant in an employee welfare benefit plan ("the Plan") sponsored by Chase.  The Plan was funded by an insurance policy ("the Policy") issued to Chase by Hartford, which served as a claim administrator for the Plan.  Under the terms of the Plan, Hartford "has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."

## A.

The Policy makes long-term disability benefits payable to a participant who becomes disabled while covered by the Policy, where that participant supplies satisfactory proof of disability to Hartford.  As relevant here, the Policy defines

2

"disabled" as occurring when, for the first twenty-four months, the employee is unable to perform one or more of the essential duties of his *own* occupation; after the first twenty-four months, in order for the employee's eligibility for benefits to continue, the employee must be unable to perform the essential duties of *any* occupation. "Any occupation," in turn, is defined as "an occupation for which [the insured is] qualified by education, training, or experience" with a specified minimum earnings potential.

But long-term disability coverage is available to active employees only, and coverage terminates on the date the employee ceases to be considered an active employee. Once an employee receives long-term disability benefits, those benefits terminate at the occurrence of the first of certain possible events, including, among others, the date the employee is no longer disabled or the failure of the employee to supply requested proof of disability.

**B.**

Before claiming disability, Sobh was employed by Chase as a Technical Operations Lead—a sedentary position that required sitting most of the day—until he stopped working as of August 5, 2009, due to back pain. On November 24, 2009, Sobh underwent back surgery. Orthopedic surgeon Joseph Dryer, M.D., Sobh's treating physician, performed the operation.

3

On January 14, 2010, Sobh applied for long-term disability benefits under the Policy. Based on medical information that it received, Hartford found Sobh disabled under the Policy and approved his long-term disability claim, with benefits effective February 3, 2010.

On three occasions between March 24, 2010, and March 11, 2011, Dr. Dryer examined Sobh and reported his findings to Hartford. Each time, based on Dr. Dryer's findings, Hartford concluded that it was "reasonable" that Sobh could not "perform frequent sitting" or return to work. As a result, Hartford continued to fund benefits for Sobh.

On July 19, 2011, Sobh underwent another surgery. Again, Dr. Dryer performed the surgery.

In 2012, Sobh applied for Social Security disability benefits citing his back injuries as proof of disability. The Social Security Administration ("SSA") approved Sobh's request for disability benefits on January 13, 2012.

Sobh received long-term disability benefits under the Plan, but as of February 3, 2012, when the initial two-year benefit period expired, Sobh was required to prove that he was unable to perform the essential duties of *any* occupation, not just *his* occupation, in order to continue receiving benefits. Towards this end, on August 9, 2012, Hartford sent Dr. Dryer a questionnaire seeking information regarding Sobh's current medical and functional status,

4

together with a request for updated treatment records.    Although Dr. Dryer completed and returned the questionnaire, stating that Sobh was "unable to work at any job" and was "permanently disabled," Dr. Dryer did not supply any updated treatment records to Hartford.    Following several requests with no response, Hartford terminated Sobh's benefits effective January 1, 2013, for failure to provide requested proof of his ongoing disability.    Hartford notified Sobh of its decision in correspondence dated December 31, 2012.

A few weeks later, however, after receiving the requested records from Dr. Dryer on January 22, 2013, Hartford reinstated Sobh's benefits on the basis that the "medical evidence on file continues to support an inability to perform occupational duties of even a sedentary nature at this time."    Another year passed with Sobh receiving benefits.

## C.

In January 2014, at Hartford's request, an investigative firm conducted video surveillance of Sobh.    In the surveillance, which was taken over two days, Sobh spent 45 minutes and 55 minutes, respectively, in a gym located in his residential community clubhouse.    According to the surveillance, each day, Sobh walked to the clubhouse, displaying no visible impairment and without the use of any assistive devices.[1]    Hartford forwarded the video surveillance to Dr. Dryer with a

---

[1] The surveillance video, however, does not depict Sobh inside the gym.

request for his assessment of Sobh's functional capacity in light of the videos, but Hartford received no response, despite several follow-up requests.

Hartford also arranged for William Dinenberg, M.D., board certified in orthopedic surgery, to conduct an independent medical examination of Sobh. In addition to his examination of Sobh, Dr. Dinenberg reviewed Sobh's medical records and the surveillance video. On April 18, 2014, he reported that Sobh was "capable of employment" that involved sitting for no greater than twenty minutes at a time, and for up to six hours total in an eight-hour workday with frequent positional changes. Dr. Dinenberg also opined that Sobh could stand for an hour and walk for an hour in an eight-hour work day. Hartford forwarded Dr. Dinenberg's report to Dr. Dryer on May 1, 2014, with a request for his comments regarding Dr. Dinenberg's findings. Dr. Dryer did not respond.

On June 6, 2014, Hartford conducted an Employability Analysis using a computer program called the "Occupational Access System."[2] Hartford concluded that five sedentary managerial occupations were suitable for Sobh based on his qualifications and the physical capabilities described by Dr. Dinenberg.

---

[2] Hartford describes this system as "a computerized job-matching program that cross-references an individual's capabilities and qualifications with 12,791 occupations as classified by the United States Department of Labor's Dictionary of Occupational Titles."

6

**D.**

Hartford notified Sobh of its decision to terminate benefits effective June 17, 2014, because it concluded, based on the information from Dr. Dinenberg, the lack of response from Dr. Dryer, and the Employability Analysis, that Sobh had become capable of performing an "occupation." In the notice, Hartford specifically acknowledged Sobh's receipt of Social Security disability benefits and noted that it is possible to qualify for such benefits without continuing to qualify for private long-term disability benefits from Hartford. The notice also explained why Hartford reached a different conclusion than the Social Security Administration regarding disability benefits.

Sobh appealed the benefits termination decision on August 25, 2014, stressing that his injury was "a chronic condition" that rendered him "totally and completely disabled." Additionally, he emphasized his receipt of Social Security disability benefits as alleged evidence of his continuing eligibility for long-term disability benefits under the Policy. Significantly, though, Sobh did not claim to be disabled by any alleged cognitive impairment arising from medication side effects.

In response to Sobh's appeal, Hartford sought an independent peer review, which Dr. James Boscardin, M.D., board certified in orthopedic surgery, conducted. In connection with his review, Dr. Boscardin also consulted with Dr.

7

Dryer on October 27, 2014, over the telephone. Dr. Dryer "expressed the opinion that . . . Sobh was capable of a fulltime sedentary position with sitting restricted to one hour at a time." Dr. Dryer also indicated that Sobh did not appear to have any issues with his long-standing use of medications. Following his review of the medical records and surveillance video, Dr. Boscardin concurred with Dr. Dryer that Sobh was "capable of a sedentary level of activity," sitting up to one hour at a time and lifting no more than ten pounds. Dr. Boscardin provided this opinion on November 17, 2014.

Then, on November 23, 2014, Hartford performed another Employee Analysis based on the restrictions and limitations recommended by Dr. Boscardin and agreed to by Dr. Dryer. The five previously identified sedentary occupations were again deemed appropriate for Sobh to perform. Two days later, by letter dated November 25, 2014, Hartford notified Sobh of its decision to uphold on appeal the termination of benefits effective June 17, 2014. In its letter, Hartford again expressly acknowledged Sobh's Social Security disability award and explained that the receipt of benefits from Hartford is determined under a different definition of disability than that used by the Social Security Administration. Additionally, Hartford explained that it had accounted for key evidence that was not considered by the Social Security Administration in 2012, such as the surveillance material and the fact that "Sobh's treating physician, Dr. Dryer," had

8

confirmed agreement that Sobh retained "the capacity to perform full-time sedentary work."

Two months later, on January 15, 2015, Sobh, through his counsel, provided Hartford with a report from Dr. Dryer dated January 9, 2015. Sobh's counsel indicated that there were "significant new findings that have led Dr. Dryer to conclude that . . . Sobh is now disabled from any type of employment." While counsel acknowledged that Dr. Dryer's "prior conclusion was that . . . Sobh could perform a sedentary job with sitting restricted to one hour at a time," he noted that Dr. Dryer "has now found him to be totally disabled." Based on Dr. Dryer's more recent report, Sobh's counsel requested that Hartford "withdraw its prior denial and resume the payment of Sobh's long-term disability benefits immediately." In the report attached to counsel's letter, Dr. Dryer acknowledged his October 27, 2014, telephone conversation with Dr. Boscardin in which he stated that Sobh was "capable of a fulltime sedentary position." But Dr. Dryer explained that, given his new findings, his opinion had "changed" and that "Sobh is disabled from any type of employment."

Hartford forwarded Dr. Dryer's January 9, 2015, report to Dr. Boscardin, who reviewed it and conferred with a staff member from Dr. Dryer's office over

the telephone.[3]  In an addendum dated February 4, 2015, Dr. Boscardin advised Hartford that the restrictions provided in his previous report remained applicable for the period of June 17, 2014, through January 9, 2015.  In this regard, Dr. Boscardin reiterated his belief that Sobh was capable of full-time sedentary work from June 17, 2014, through January 9, 2015.  But Dr. Boscardin agreed that Sobh was "precluded from sedentary function" after January 9, 2015.

On February 16, 2015, Hartford advised Sobh that the decision to terminate his long-term disability benefits effective June 17, 2014, remained unchanged. Hartford acknowledged the opinions of Dr. Boscardin and Dr. Dryer that Sobh was precluded from sedentary work as of January 9, 2015.  But Hartford emphasized that both doctors agreed that Sobh was able to perform full-time sedentary work between June 17, 2014, and January 9, 2015.  Accordingly, Sobh did not meet the definition of "disabled" during that timeframe, and his benefits were properly terminated.  And because Sobh was no longer covered by the Policy on January 10, 2015, since he was not employed by Chase at that time, he was not entitled to benefits.

**II.**

---

[3] An issue of fact exists as to whether the person with whom Dr. Boscardin spoke on the phone was a nurse or a medical secretary.  Hartford has moved to strike the portions of the reply brief where this reference is made.  Similarly, Sobh has moved for the Court to take judicial notice of the website LinkedIn to establish that the person with whom Dr. Boscardin spoke was a medical secretary, not a nurse.  The distinction makes no difference to our analysis, so we **DENY** both motions.

10

Sobh filed suit against Hartford, challenging Hartford's decision to terminate his long-term disability benefits.  In his complaint, Sobh asserted a claim that the termination decision was *de novo* wrong, that the decision was unreasonable in light of Hartford's alleged conflict of interest, and that the case should be remanded to the administrator.

Hartford and Sobh each moved for summary judgment on all claims.   The district court granted summary judgment to Hartford and denied summary judgment to Sobh.   Sobh now appeals all adverse summary-judgment rulings against him.

## III.

We review a district court's grant of summary judgment *de novo*, applying the same standard used by the district court.  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).  The review of an ERISA benefits decision is "limited to consideration of the material available to the administrator at the time it made its decision." *Id.*

We use a six-step test to review a plan administrator's benefits decision:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with

11

discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Id.* at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010).

The parties do not dispute that the Plan vests Hartford with discretion. In this regard, the Plan states, "We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." Because Hartford both funded and administered the Policy, the district court concluded correctly that the heightened arbitrary-and-

capricious[4] standard of review applied if, after *de novo* review, it determined that the claim administrator's benefits-denial decision was wrong. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008) (where plan administrator is itself a professional insurance company, a conflict of interests exists); *Blankenship*, 644 F.3d at 1355.

As noted above, however, when we agree with the decision of the administrator, we need not decide whether a conflict exists. Only when we disagree with the decision to deny benefits do we look for a conflict, and when we find one, we reconsider the decision in light of this conflict. *See Maracek v. BellSouth Telecomm., Inc.*, 49 F.3d 702, 705 (11th Cir. 1995); *Blankenship*, 644 F.3d at 1355.

## IV.

We begin by undertaking a *de novo* review of the administrator's decision to determine whether the administrator's benefits denial was wrong. "A decision is wrong if, after a review of the decision of the administrator from a *de novo* perspective, the court disagrees with the administrator's decision." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (citation and internal quotation marks omitted).

---

[4] We equate the arbitrary-and-capricious standard with the abuse-of-discretion standard. *Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1356, n.1 (citing *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989)).

Under ERISA, Sobh has the burden of proving his entitlement to contractual long-term disability benefits. *See Horton v. Reliance Standard Life Ins. Co.,* 141 F.3d 1038, 1040 (11th Cir. 1998). Sobh must show that he was "disabled" within the meaning of the Plan at the time benefits were terminated to demonstrate that Hartford's decision was "wrong." *See Glazer*, 524 F.3d at 1247.

As we have noted, under the Plan's definition of "disabled," to receive long-term disability benefits during the initial twenty-four months, a participant must demonstrate that he is unable to perform his *own* occupation. For a participant to continue receiving benefits after this initial twenty-four-month period, however, he must show that he cannot perform *any* occupation. Here, the initial twenty-four-month period is not relevant because Sobh applied for and received those benefits. Rather, we focus our analysis on whether Sobh could perform *any* occupation following the initial twenty-four month period—the period following February 3, 2010. Here, we look to whether Sobh could perform any occupation as of June 17, 2014, when Hartford terminated his benefits.

Hartford based its June 17, 2014, termination of benefits primarily on an independent medical examination that Dr. Dinenberg conducted in April 2014. Hartford did not arrange for Dr. Dinenberg's examination of Sobh until after Dr. Dryer failed to respond to Hartford's request for an updated assessment of Sobh's functionality in light of the videotape surveillance of Sobh. We find no error in

14

Hartford's reliance on Dr. Dinenberg's conclusion that Sobh had the capacity to engage in full-time work, particularly in light of the surveillance video and Dr. Dryer's lack of response. *See Blankenship,* 644 F.3d at 1356 (administrator acted reasonably in relying on independent medical opinions).

And, although Hartford was entitled to rely on Dr. Dinenberg's report, we note that Hartford made yet another attempt to obtain Dr. Dryer's input before terminating benefits. More particularly, Hartford provided Dr. Dryer with Dr. Dinenberg's report and again requested his comments regarding Sobh's capability to perform work. Once again, though, Dr. Dryer did not respond. Hartford also conducted an Employability Analysis, finding that Sobh could be employed in five managerial positions.

Here, Sobh's assertion that Hartford disregarded his treating physician's opinion in favor of Dr. Dinenberg's is simply not supported by the record. The record demonstrates that Hartford did accord Dr. Dryer's opinion weight. Hartford relied on Dr. Dryer's opinion as a basis for awarding Sobh benefits for many years. Hartford turned to an independent physician only when Dr. Dryer failed to respond to repeated requests for information. ERISA claim administrators "need not accord extra respect to the opinions of a claimant's treating physicians," but rather may credit "independent medical opinions" instead. *Blankenship*, 644 F.3d at 1356. Under the terms of the Policy, Hartford could terminate benefits if requested

15

proof of disability was not provided.  Here, the lack of response from Dr. Dryer, in conjunction with the surveillance video, the opinion of Dr. Dinenberg, and the Employability Analysis sufficiently substantiated Hartford's decision to terminate Sobh's benefits.

Moreover, even after Hartford ended Sobh's benefits, after Sobh appealed Hartford's decision, Dr. Dinenberg reached out to Sobh's treating physician, Dr. Dryer to obtain his opinion with respect to Sobh's abilities.  Significantly, when Dr. Dinenberg spoke to Dr. Dryer in October 2014, Dr. Dryer agreed that Sobh was able to perform sedentary work.  So when Hartford issued its final decision in November 2014, it relied on the opinions of Sobh's treating orthopedic surgeon, Dr. Dryer, and a board-certified independent medical consultant, Dr. Boscardin. Both doctors agreed that Sobh was capable of full-time sedentary work in October/November 2014.[5]   In light of this evidence, we find no error in the administrator's decision to terminate benefits.  At the latest, Sobh was no longer disabled as of October/November 2014, and Hartford properly discontinued his benefits.

Because Sobh was able to perform sedentary work as of the Fall 2014, his reliance on Dr. Dryer's January 2015 opinion cannot help him reestablish disability benefits.  We recognize that Dr. Dryer reported "significant new findings" that

---

[5] Dr. Dryer expressly confirmed, both verbally and in writing, that he considered Sobh to be "capable of a full-time sedentary position" on October 27, 2014.

"changed" his opinion as to Sobh's disability. But in his January 2015 report, Dr. Dryer acknowledged his prior conclusion that Sobh could perform a sedentary job. The Policy specifically provides that Sobh's long-term disability benefits would continue only while he remained both disabled and eligible for benefits. The fact that Sobh became disabled again as of January 9, 2015, does not change the fact that his disability coverage terminated, at the latest, in November 2014. And because Sobh's benefits were properly terminated in 2014, he was not eligible under the Plan in January 2015, when he became disabled again, since he was no longer employed by Chase. Under these facts, we find Hartford's termination decision was not *de novo* wrong. We therefore affirm the district court's decision upholding Hartford's denial of benefits.

Finally, the fact that the Social Security Administration granted disability benefits to Sobh in 2012 does not alter our conclusion. First, the determination of "disability" under the Plan differs in significant respects from the framework that the Social Security Administration applies when it considers whether an individual is disabled.[6] Second, the circumstances that caused Hartford to conclude that Sobh was no longer disabled did not occur until *two years after* the Social Security Administration's determination. The Social Security Administration did not have

---

[6] Unlike ERISA claim administrators, whose disability assessments are governed by plan documents, the Social Security Administration employs a highly particularized, five-step "sequential evaluation process" prescribed by federal regulations. *See* 20 C.F.R. § 404.1520(b)-(g).

17

before it at the time it made its disability determination, the surveillance video recordings or Sobh's treating physician's opinion that Sobh was able to perform sedentary work. Accordingly, the Social Security Administration's determination from over two years earlier is of little consequence. *Compare Melech v. Life Ins. Co. of N. America*, 739 F.3d 663 (11th Cir. 2014).

## V.

For all of these reasons, we affirm the district court's order granting Hartford's motion for summary judgment. We also affirm the district court's denial of Sobh's motion for summary judgment.

**AFFIRMED.**