[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15259
Non-Argument Calendar

_____

D.C. Docket No. 4:13-cv-01947-VEH

GREG OLIVER,

Plaintiff-Appellant,

versus

AETNA LIFE INSURANCE COMPANY,
FEDERAL EXPRESS CORPORATION LONG TERM DISABILITY PLAN,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(July 10, 2015)

Before JORDAN, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

This appeal arises from the denial of a claim for long-term disability

benefits.  Plaintiff-appellant Greg Oliver ("Oliver") appeals the district court's

grant of summary judgment to defendant-appellee Aetna Life Insurance Company ("Aetna") on Oliver's claim, brought under § 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, that Aetna wrongfully denied him benefits.

## I.    BACKGROUND

Oliver worked as a courier for the Federal Express Corporation ("FedEx"), and participated in its Long Term Disability Plan ("the Plan"). In addition to being the sponsoring employer of the Plan, FedEx is its administrator. Aetna, however, is the claims-paying administrator of the Plan, and is responsible for making benefits determinations.

Oliver has a long history of bone and joint problems, including degenerative disc disease in his spine and osteoarthritis in his knee. In 1991, he tore his left anterior cruciate ligament, after which he developed severe arthritis in that knee. An examination of his knees in July 2009 revealed that

> His range of motion [in the left knee] was near to complete extension to one-hundred twenty degrees of flexion. There was positive patellar crepitus, negative instability, and positive medial and lateral joint line tenderness. Three x-ray views of the bilateral knees showed mild degenerative disease of the right knee and some patellofemoral disease. The left knee showed the prior anterior cruciate ligament screws in the femur and tibia. The femoral screw was protruding laterally, and the tibial screw was penetrating in the joint. There was also medial compartment sclerosis as well as patellofemoral disease. The assessment noted osteoarthritis, left knee.

2

At that time, Oliver reported that his knee pain was exacerbated by walking or standing for more than half an hour.  He has had three surgeries on the left knee, the most recent being an October 2010 total knee replacement.[1]  This last surgery has alleviated, but not eliminated, what had been a persistently painful condition.

Oliver has had less luck in treating his lower back pain, from which he has suffered since 2005.  Examinations from October 2009 to February 2010 revealed numerous structural and functional abnormalities in his spine, lumbar-area tenderness, and muscle spasms.  Oliver had limited ranges of motion involving his lower back, and experienced pain in performing those lower-back movements.  His reports of back pain varied from examination to examination.  He reported pain "while performing daily activities and certain motions."  Long periods spent walking around and repetitive movements exacerbated his pain.  Various non-invasive treatments were performed, such as electrical stimulation of the tissues, and Oliver was instructed in proper sleep positioning and other ways to alleviate his pain.

In addition to his longstanding knee and back problems, Oliver was injured on the job on August 15, 2009.[2]  Following that injury, Oliver received short-term

---

[1]  Elsewhere it is reported that Oliver has had four knee surgeries.

[2]  The record does not reveal the specifics of this injury.

3

disability benefits under the Plan from August 24, 2009 to February 21, 2010.  This was followed by long-term *occupational* disability benefits from February 22, 2010 to February 21, 2012.  That 24-month period was the maximum allowed under the Plan for long-term occupational disability.

Before the expiration of Oliver's long-term occupational disability benefits, Aetna notified him that he would have to qualify for long-term *total* disability benefits under the Plan to continue receiving benefits after the 24-month period.  To receive the long-term total disability benefits, he would have to meet a more demanding definition of disability than that required for long-term occupational disability benefits:  he would have to show a "complete inability . . . to engage in any compensable employment for twenty-five hours per week."

Oliver applied for long-term total disability benefits to begin on February 22, 2012, when his long-term occupational disability benefits were to terminate.  His claim was denied on January 12, 2012, and he filed an appeal to the Aetna Appeal Review Committee ("AARC").  On March 13, 2012, Oliver was notified by Aetna representative Linda Bizzarro that his appeal had been denied the day before, "because there [wa]s a lack of significant objective findings to substantiate a claim under the Plan for Total Disability."

In the meanwhile, on January 17, 2012, Oliver had received a favorable disability decision from the Social Security Administration ("SSA"), which found that he had become disabled for purposes of the Social Security Act as of August 15, 2009, the date at which Oliver had been injured on the job.  *See* 42 U.S.C. §§ 416(i); 423(d).  The AARC had been notified of this favorable SSA determination on February 28, 2012, and made note of it in denying Oliver's appeal.  The AARC explained, however, that "the criteria utilized by the [SSA] for . . . disability awards are different from the definition for Total Disability set forth in the Plan."  Thus, the intervening SSA determination did not dictate the outcome of the AARC review of the initial denial of long-term total disability benefits.

Oliver filed for suit against Aetna for its denial of long-term total disability benefits on September 11, 2013 in the Circuit Court of Etowah County, Alabama. Aetna removed the case to the Northern District of Alabama on October 22, 2013, because the case raised a federal question under ERISA and ERISA gives the district courts and state courts concurrent jurisdiction over actions brought under 29 U.S.C. § 1132(a)(1)(B).[3]  *See* 28 U.S.C. § 1331; 29 U.S.C. § 1132(e)(1).  In an order ruling on various motions, the district court granted Aetna's motion for

---

[3] A participant in, or beneficiary of, an ERISA-governed plan has a private right of action "to recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B).

5

summary judgment, holding that its denial of long-term total disability benefits to Oliver was not wrong.[4]

Oliver filed this appeal from the district court's grant of summary judgment to Aetna.  Oliver argues that the district court incorrectly placed the burden of proof on him to show that Aetna's denial of benefits decision was wrong.  From there, he says, the court erred in finding no error in Aetna's denial of benefits.  In particular, the court allegedly erred by accepting Aetna's argument that because its definition of long-term disability used "different criteria" than those used by the SSA, the favorable SSA ruling did not control Aetna's determination.  Oliver further argues that the district court applied an incorrect standard of review in its alternative holding[5] that, even if wrong, Aetna's denial of benefits was not arbitrary and capricious.  Rather than this more deferential standard, which the district court held would apply, Oliver contends that a *de novo* standard applies.  Finally, Oliver argues that the doctrine of judicial estoppel should have applied to prevent the termination of his benefits.

---

[4]  The district court also held in favor of Aetna on its counterclaim for $5,912.63 in overpaid long-term disability benefits, due it to offset the benefits paid to Oliver by the SSA. Oliver has not argued on appeal that this was error.

[5]  Because the district court did not find the denial of benefits to be wrong under its initial *de novo* review, it did not have to address the standard of review that would have been appropriate if Aetna's decision had been deemed to be incorrect. Nonetheless, in the interest of completeness, it determined that, given the discretion afforded the administrator, the arbitrary and capricious standard would apply in this scenario, and that the decision was not arbitrary or capricious.

6

## II.    STANDARD OF REVIEW

We review *de novo* a district court's decision affirming an ERISA plan administrator's determination regarding benefit eligibility, applying the same standards as the district court.  *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011).  Our review considers only "the material available to the administrator at the time it made its decision."  *Id.*

Because ERISA does not set out a standard of review for challenges to the denial of benefits brought under 29 U.S.C. § 1132(a)(1)(B), this Court has developed a multi-part test, relying on the Supreme Court's opinions in *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101, 109 (1989), and *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 111 (2008).  We proceed in the following manner:

> (1)    Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

7

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)    If there is no conflict, then end the inquiry and affirm the decision.

(6)    If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

## III.   ANALYSIS

Our analysis in this case begins and ends at the first step of the test.  Upon our *de novo* review, we conclude that Aetna's determination that Oliver is not entitled to long-term disability benefits was not "wrong."  "A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, 'the court disagrees.'"  *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) (quoting *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 & n.8 (11th Cir. 2004)).  We consider, "based on the record before the administrator at the time [the] decision was made, whether [we] would reach the same decision as the administrator.  If [we] determine[] that the plan administrator was right, the analysis ends and the decision is affirmed."  *Id.* at 1246–47.  Contrary to Oliver's assertions, it is the law in this Circuit that when appealing the plan administrator's denial of long-term disability benefits, the plaintiff bears the

8

burden to prove that he is disabled. *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1362 (11th Cir. 2008); *Glazer*, 524 F.3d at 1247; *see also* 29 U.S.C. § 1132(a)(1)(B) (2014). Oliver has not carried that burden.

## A. "Total Disability" Under the Plan and the SSA Test

Because Oliver's argument relies in large part on the fact that the SSA determined that he was totally disabled, we begin our analysis by comparing the SSA test for total disability with that of the Plan. "A district court may consider the [SSA's] determination of disability in reviewing a plan administrator's determination of benefits." *Kirwan v. Marriott Corp.*, 10 F.3d 784, 790 n.32 (11th Cir. 1994). However, we have held that "the approval of disability benefits by the [SSA] is not considered dispositive on the issue of whether a claimant satisfies the requirement for disability under an ERISA-covered plan." *Whatley v. CNA Ins. Companies*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (citing *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n.5 (11th Cir. 1997)).

The SSA test consists of a five-step sequence that the administrative law judge ("ALJ") follows in determining the claimant's eligibility for long-term disability benefits.

> At step one, the [ALJ] must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. If an individual engages in SGA, he is

9

not disabled regardless of how "severe" his physical or mental impairments are and regardless of his age, education or work experience.  If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the [ALJ] must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).    An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  If the claimant does not have a "severe" medically determinable impairment or combination of impairments, he is not disabled.  If the claimant has a "severe" impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the [ALJ] must determine whether the claimant's impairment or combination of impairments is of a severity to meet or equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).  If the claimant's impairment or combination of impairments is of a severity to meet or equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the [ALJ] must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).  An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.    In making this finding, the [ALJ] must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e) and 404.1545; SSR 96-8p).

Next, [the ALJ] must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 404.152(f)).  The term past relevant work means work performed (either as the claimant actually performed it or

10

as it is generally performed in the national economy) within the last 15 years. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b) and 404.1565). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g)), [the ALJ] must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner of the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Commissioner is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g) and 404.1560(c)).

 "Disability" under the SSA test, means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."

By contrast, the Plan here describes the following procedure for providing disability benefits:

11

Section 5.1.  Proof of Disability.  No Disability Benefit shall be paid under the Plan unless and until the claims Paying Administrator has received an application for benefits and information sufficient for the Claims Paying Administrator to determine pursuant to the terms of the Plan that a Disability exists.  Such determination shall be made in a fair and consistent manner for all participants in the Plan.  Such information may, as the Claims Paying Administrator shall determine, consist of a certification from the Covered Employee's attending Practitioner, in a the form of personal references, narrative reports, pathology reports, x-rays and any other medical records or other information as may be required by the Claims Paying Administrator.  In addition, a Covered Employee may be required, as the Claims Paying Administrator shall determine, to submit to continuing proof of Disability in the form of the information described above, as well as evidence that he continues to be under the care and treatment of a Practitioner during the entire period of Disability.  If, in the opinion of the Claims Paying Administrator, the Practitioner selected by the Covered Employee cannot substantiate the Disability for which a claim is being made or benefits are being paid hereunder, such Employee may be required to submit himself to an examination by a Practitioner selected by the Claims Paying Administrator.  The burden of proof for establishing a Disability is on the Covered Employee.

Under the Plan, determinations of "disability" require "significant objective findings which are defined as signs which are noted on a test or medical exam and which are considered significant anatomical, physiological or psychological abnormalities which can be observed apart from the individual's symptoms."  The Plan further defines "total disability" as "the complete inability . . . because of a medically-determinable physical or functional impairment . . . to engage in any compensable employment for twenty-five hours per week."

12

Thus, the Plan's test for total disability differs in several ways from that of the five-step SSA test.  First, the SSA test categorizes as disabled one who cannot perform "substantial gainful activity."   Under the Plan, however, total disability means "the complete inability . . . to engage in any compensable employment for twenty-five hours per week."  Thus, the Plan imposes a higher standard upon a claimant.  Second, the fifth step of the SSA test precludes a finding of disability, even for a person able to perform work, unless the SSA Commissioner can prove the existence of jobs, in significant numbers, that the claimant can do, given not only his impairment, but also his age, education, and work experience.  In contrast, the Plan does not take the availability of jobs into consideration.  Third, the SSA test, as interpreted by this Circuit, recognizes that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Francis v. Heckler*, 749 F.2d 1562, 1564 (11th Cir. 1985).  The Plan, by contrast, requires "significant objective findings . . . which can be observed apart from the individual's symptoms."  Or, as Aetna explained to Oliver, "Pain, without significant objective findings, is not proof of disability."  Finally, although a court must give special weight to the opinions of a claimant's treating physician in social security cases, the same deference does not apply to disability determinations

13

under employee benefit plans governed by ERISA.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

Thus, based on our precedent and the manifestly different criteria of the SSA and the Plan, Oliver cannot simply rely on the determination by SSA in challenging Aetna's denial of benefits.  Rather, the question of whether the denial of benefits was wrong must turn on the evidence of disability itself.  We turn now to that evidence.

**B.    The Evidence Presented in Support of Oliver's Claim**

Oliver bore the burden of producing evidence to show his entitlement to long-term disability benefits.  *See Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).  Our analysis therefore turns to the evidence submitted by Oliver to Aetna in support of his claim for long-term total disability benefits.  *See Glazer*, 524 F.3d 1246-47.  We summarize the key portions of that record.

On January 12, 2010, orthopedic surgeon Dr. Lawrence J. Lemak stated in a clinic note that, "[g]iven the extent of [Oliver's] arthritic change in his knee and the demands of his profession as a FedEx truck driver, we supported [Oliver's] thoughts of heading down application route [sic] for disability . . . [W]e do not feel he would be able to effectively perform *his job as a truck driver*."

14

A June 7, 2010 office note from neurosurgeon Dr. Joel O. Pickett appeared to show some responsiveness to treatment. Dr. Pickett stated that Oliver's "leg pain has resolved with an epidural steroid injection, although he still has some lower back pain. Overall he seems to be doing better and is getting about well [sic]." Dr. Pickett noted that Oliver appeared to have stenosis of the L4-5 vertebrae, for which he recommended epidural steroid injections and physical therapy. If those treatments failed to resolve his back pain, Dr. Pickett would "look into this further with a lumbar myelogram and possibly proceed with surgery."

On October 11, 2010, Oliver underwent total knee replacement surgery on his left knee, which seemed to improve his condition considerably. Dr. Lemak's office notes from December 14, 2010 recorded Oliver's progress since that surgery. Dr. Lemak described Oliver as "doing extremely well. He is advised to continue his range of motion and muscle strengthening exercises. He will follow up in 4 months."

On January 21, 2011, however, Dr. Lemak submitted a physician's report on Oliver, indicating that, due to his osteoarthritis, Oliver could neither work "Full Duty" nor "with Restrictions." Dr. Lemak did indicate that Oliver's condition had

15

not reached a "PERMANENT & STATIONARY status." He advised that Oliver should perform "no work until re-evaluated on 4/5/2011."

On April 8, 2011, Oliver underwent an MRI of his lumbar vertebrae, which was evaluated by Dr. Arthur A. Jones and Dr. David Simmons. Those physicians summarized that "[t]here is a diffusely narrowed central canal throughout the lumbar spine with accompanying short pedicles. There are disc herniations at L4-5 and L5-S1 that are slightly asymmetric to the right with narrowing of the right lateral recesses at these two levels and probable nerve root impingement of L5 and S1." They made no note of how this might affect his work ability.

On April 11, 2011, Dr. Faulkner, an orthopedic surgeon and colleague of Dr. Lemak, produced a clinic note on Oliver after reviewing his medical history, performing a physical exam, and evaluating x-rays of his spine. Dr. Faulkner concluded that Oliver had "Degenerative disc disease at multiple levels." Dr. Faulkner recommended against surgery, but believed Oliver should "get on a home exercise program."

Dr. Lemak concluded on September 9, 2011, after evaluating Oliver, "it's my professional opinion that *he will be unable to return to Federal Express as a Courier, secondary to total knee replacement*."[6] Dr. Lemak examined Oliver three

---

[6] As mentioned, Oliver underwent total knee replacement on October 11, 2010, which Dr. Lemak recognizes in his December 14, 2010 note and again in his December 15, 2011 note.

16

months later, and in his clinical notes stated that Oliver was "doing well.  He does not have any pain.  He will occasionally feel soreness if he has been on it for a while."  The clinic notes record that "[a]t this time, we will recommend him to continue his strengthening exercises for his left knee as well as range of motion.  In regards to his work, *since his work involve [sic] lot [sic] of walking around, which might affect the longevity of his knee, we would like to keep him off work*."  On that basis, Dr. Lemak, in response to an inquiry from Aetna, stated that in his opinion Oliver was "unable to work at any compensable employment for a minimum of twenty-five hours per week."

Aetna referred these materials to an orthopedic surgeon, Dr. Lawrence Blumberg, on December 23, 2011, for independent review.[7]  After summarizing the records, Dr. Blumberg gave his opinion on January 8, 2012 that Oliver could engage in some compensable employment for a minimum of 25 hours per week, explaining:

> The claimant's physical examination findings for the left knee revealed a well-healed incision with no effusion.  There was essentially normal range of motion and a stable knee.  The x-rays

It is thus not clear what Dr. Lemak means by "secondary to total knee replacement" in the September 9, 2011 note.

[7]  Dr. Blumberg reviewed the following materials:  (1) "Office note from Dr. Joel Pickett, Neurosurgeon dated 6/7/10"; (2) "Office note from Dr. Faulkner, Orthopedic Surgeon dated 4/21/11"; (3) "Office notes from Dr. Lemak dated 12/14/10, 4/21/11 and 12/15/11"; and (4) "Work Status Letter from Dr. Lawrence Lemak, Orthopedic Surgeon dated 12/15/11."

17

revealed good alignment of the total knee components.  There was no evidence the claimant couldnot [sic] stand, sit, or ambulate.  There is no evidence the claimant could not lift up to ten pounds.  He is therefore capable of at least any occupation/sedentary activities for a minimum of 25 hours per week.

Based on Dr. Blumberg's review, Aetna denied Oliver's claim for long-term total disability benefits on January 12, 2012, and Oliver appealed.

On February 17, 2012, Aetna submitted the records Dr. Blumberg reviewed, along with further medical records produced by Oliver, to Dr. Martin Mendelssohn, another orthopedic surgeon, to review for Oliver's appeal.[8]  Dr. Mendelssohn came to the same conclusion that Oliver could work some compensable employment for a minimum of 25 hours per week, explaining:

> This claimant has chronic problems in his low back but is not a surgical candidate although he has degenerative changes and abnormalities at multiple levels with MRI, his clinical examination is nonfocal and it was determined by his spine surgeon that he is not a surgical candidate.  In the past he has received an epidural injection which resolved his leg symptomatology, but the claimant continues to have axial back pain without neurological findings.  With respect to his left knee, he underwent a total knee arthroplasty.  There has been no documentation any complication [sic].  He has functional range of motion, no instability.  X-rays reveal the components are in excellent position without evidence of loosening, and there is no evidence documented that the claimant would not be able to stand, sit, or

---

[8] In addition to the materials submitted to Dr. Blumberg, Dr. Mendelssohn was presented with (1) "General Peer Review Dr. Blumberg 12/27/11"; (2) "Note from Dr. Pickett 05/10/10"; (3) "Physician Report Dr. Lemak 01/21/11"; (4) "MRI Lumbar Spine 04/08/11"; (5) "MRI Result Sheet 04/21/11"; (6) "Patient Pain Drawing 04/21/11"; (7) "Patient Referral 04/21/11"; (8) "Dictation Tracking Sheet 04/21/11"; (9) "Correspondence from Dr. Lemak 09/09/11"; and (10) "Surgery & Diagnostic Order Sheet undate [sic]."

ambulate nor would be unable to lift a minimum of ten pounds and therefore, the claimant is able to function in a sedentary occupation for a minimum of 25 hours per week.

Based upon Dr. Mendelssohn's review, the AARC denied Oliver's appeal on March 13, 2012.

Upon this Court's *de novo* review of the record, we conclude that Aetna was not wrong in denying long-term disability benefits to Oliver. First, as discussed, the Plan sets a more demanding standard for total disability than what the SSA test imposes. Therefore, Aetna's denial of disability is not necessarily called into question by the SSA ruling. Second, the records submitted to Aetna fail to establish that Oliver can perform no compensable employment for a minimum of 25 hours per week. The clinical notes from Oliver's treating physicians consistently show that his back pain was treatable, probably with physical therapy rather than surgery, and there was no indication that the pain Oliver suffered from his back condition would prevent him from performing various, probably non-manual labor, jobs. The record of his knee problems likewise provide no basis for concluding that Oliver could not perform some form of sedentary employment. Further, Dr. Lemak gave no reasons for the change of prognosis between September 2011, when he stated that Oliver would be unable to return to work as a courier, and December 2011, when he stated that Oliver could perform no

19

compensable work for 25 hours a week.  Lemak's own clinical notes from that period record that Oliver experiences "no pain" unless he is using the leg for some period of time, and that work as a courier was to be avoided, because it involved a lot of moving around, which could interfere with Oliver's recovery.  It did not explain why sedentary employment would be problematic.

Because Oliver's SSA determination was submitted to the AARC for its review, and therefore constitutes part of the record we review, we note from the ALJ's order certain facts that support the AARC's decision to deny benefits to Oliver.  At the SSA hearing, Oliver testified about his daily routine, which the ALJ summarized:

> [H]e arises at 6:00 in the morning, gets coffee, and is then from the bed to the couch, due to stiffness.  He testified that he eats breakfast at 8:00, and *assists with getting the children off to school*.  He testified that *he takes a one-hour class two days per week*, and becomes stiff in class, he is able to get up and move around during class.  He reported being at the hearing for two hours increased his pain level.  He testified that *he drives approximately twenty to twenty-five miles per week*.  He also testified that *he attends church on Sundays*.  The claimant testified that he takes Lortab and Robaxin as needed but that the Lortab causes drowsiness, sweating, and sometimes keeps him awake.  He further testified that two or three times weekly, he has to elevate his knee for one hour at a time; and that he has trouble manipulating steps and stairs at times.  He testified that he received steroidal treatments to the knee and epidurals to his back; and is currently in physical therapy where he performs stretching exercises.  In addition, *the claimant testified that he is able to walk twenty-five yards; and if necessary, could walk goal post to goal post*.  He also testified that *he is able to stand for twenty minutes, and sit for thirty*

*minutes to an hour.* He testified that *he is able to lift ten pounds.* He testified that his father-in-law and wife perform the yard work. He testified that golf and softball were prior hobbies, but he had not played in two years. He testified that *his girls participate in sports activities, and he occasionally attends the functions*, but has difficulties climbing the steps in the sports arenas, and has to frequently stand, until he is no longer able to stand comfortably. He also testified that the heat and cold temperatures worsen the pain. *He testified that he is unable to return to work at his prior job as a courier, because it required a lot of lifting, walking, and driving. He testified that he feels his [sic] is unable to work a forty-hour week because his back will not hold up.*

Oliver's SSA testimony thus reveals that, although he experiences pain and has difficulties in getting around, he is able to participate in various activities: getting his children ready for school; attend classes, church, and sporting events; drive a car; walk short distances; and participate in physical therapy. This level of activity that Oliver testified that he can manage is consistent with many part-time, fairly sedentary jobs.[9]

For these reasons, we determine, upon *de novo* review, that Aetna was not wrong in denying long-term disability benefits to Oliver because, based on the evidence Oliver presented to Aetna and the AARC, the latter's conclusion that

---

[9] Further, the determination of the ALJ was that "[m]edical improvement is expected with appropriate treatment. Consequently, a continuing disability review is recommended in 12 months." Thus, as the district court noted, "Oliver, at best, has established a period of *non-permanent* total disability under the SSA as of January 17, 2012."

21

Oliver was not totally disabled, as defined by the Plan, was not incorrect.[10]

### C.    Does Judicial Estoppel Apply?

Oliver's final argument is that Aetna should be judicially estopped from disagreeing with the SSA's conclusion that Oliver was totally disabled.  Oliver argues that because its plan required him to apply for SSA benefits, Aetna implicitly endorsed the SSA criteria of total disability, and its findings.  But the Eleventh Circuit case relied upon by Oliver—*Melech v. Life Insurance Company of North America*, 739 F.3d 663 (11th Cir. 2014)—does not support his argument.[11]

In *Melech*, while considering claimant Melech's claim for disability benefits under the employee plan, the plan administrator had required Melech to apply for SSA benefits. Yet, in ultimately deciding to deny benefits under its plan, the administrator refused to consider any evidence from the SSA process, making its

---

[10]  As noted, the district court sustained Aetna's finding of no disability on the alternative ground that the Plan gave AARC discretion over the decision whether Oliver was disabled and, that being so, even a "wrong" decision by AARC would not be reversible unless that decision was arbitrary and capricious.  The court concluded that AARC's decision was neither arbitrary nor capricious.  Although we perceive nothing faulty about the district court's reasoning on this point, we do not have to firmly decide this matter, given our conclusion that, even under a *de novo* review, Aetna's decision that there was no qualifying disability was not a "wrong" decision.

[11]  The district court held that because Oliver only raised his judicial estoppel argument at summary judgment, rather than in his complaint, it was procedurally improper.  The court nonetheless held that the argument failed on the merits.  Because we agree with the district court that the judicial estoppel argument is meritless, we affirm on that ground.

decision on a record that excluded any information that was available from that agency. *Id.* at 673. The district court held that the administrator's decision was correct based on the record before it, but again this record did not include any of the SSA information.

We reversed, but not because we concluded that, having required the claimant to simultaneously pursue SSA benefits, the administrator was judicially estopped from doing anything but adhering to the SSA's decision. Instead, explaining that the administrator "is not free to selectively use evidence in this manner," *id.* at 675, and that "an administrator's decision to deny benefits must be based on a complete administrative record," *id.* at 676, we reversed because we concluded that the administrator had acted in a way that created "procedural unfairness" to Melech. *Id.*

Indeed, had we concluded that the administrator was judicially estopped from contesting a finding of disability by the SSA, we would have simply reversed and directed a judgment for Melech. But we did not do that. We remanded the case, requiring only that the administrator "decide Melech's claim with the full benefit of the results generated by the SSA process that it helped to set in motion." *Id.* at 676-77. Indeed, we were quite explicit that we were not "prejudg[ing] the ultimate outcome" on remand, stating "We do not imply that the SSA's ultimate

23

conclusion that Melech was 'disabled' under the SSA standard creates a presumption that she is eligible for benefits under the Policy." *Id*. at 676 and n.21.

Unlike the administrator in *Melech*, the administrator in this case did take Oliver's SSA determination into account when it considered his appeal. Thus, the concern about procedural unfairness that troubled the Melech court does not arise in this case. Second, because the favorable SSA determination did not create a presumption of disability under the Plan and because Aetna explained to Oliver that the Plan imposed a different definition of disability than that used in the SSA test, there is no reason to conclude that Aetna was acting arbitrarily and capriciously when it reached a different decision than did the SSA. *See Whatley*, 189 F.3d at 1314 n.8. We therefore reject Oliver's judicial estoppel argument.

## IV.    CONCLUSION

For the above reasons, we affirm the district court's grant of summary judgment in favor of Aetna. In doing so, we conclude, based on our *de novo* review of Aetna's denial of benefits to Oliver, that its decision was not wrong. We further reject Oliver's argument that judicial estoppel operates to require Aetna to follow the SSA's determination that Oliver is totally disabled.

**AFFIRMED.**

24