[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16935
Non-Argument Calendar
_____

D.C. Docket No. 8:15-cv-01703-VMC-TGW

KRISTIAN HORNELAND,

                                             Plaintiff - Appellant,

versus

UNITED OF OMAHA INSURANCE COMPANY,

                                             Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 17, 2017)

Before MARCUS, WILSON, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Kristian Horneland ("Plaintiff") sued United of Omaha Life Insurance Company ("Defendant") under the Employee Retirement Income Security Act ("ERISA") for denying Plaintiff long term disability benefits on the grounds that Plaintiff was either not disabled or, if he was disabled, his disability was the result of a pre-existing condition. The parties filed cross-motions for summary judgment solely on the issue of whether the pre-existing condition exclusion applied, and the district court entered judgment for Defendant. Plaintiff moved to alter or amend the court's findings of fact or judgment, but the district court denied the motion. Plaintiff appealed the district court's rulings on both summary judgment and the postjudgment motion. After thorough consideration of both the record and the parties' briefs, we conclude that there are genuine issues of material fact that preclude entering summary judgment in favor of either party. Accordingly, we **REVERSE** the district court's entry of summary judgment for Defendant, **AFFIRM** the district court's denial of summary judgment to Plaintiff, **DENY AS MOOT** Plaintiff's motion to alter or amend findings of fact or judgment, and **REMAND** for further proceedings.

2

## BACKGROUND

On March 12, 2012, Plaintiff was hired as a real estate manager for Thornton's, Inc., a gasoline and convenience store chain. As part of his employment, Plaintiff received both short term and long term disability coverage under Defendant's insurance plans. Both plans are governed by ERISA. Although his employment began on March 12, 2012, his long term disability coverage did not begin until he had completed twelve months of employment (disability coverage began "on the day following completion of 12 months of Active Employment,"); that is, it did not begin until March 12, 2013.

In addition, the long term disability policy includes a Pre-existing Conditions Exclusion that states:

### Pre-existing Conditions

We will not provide benefits for Disability:

    (a) caused by, contributed to by, or resulting from a Pre-existing
        Condition; and
    (b) which begins in the first 12 months after You are continuously insured
        under this Policy

A **Pre-existing Condition** means any Injury or Sickness for which You received medical treatment, advice or consultation, care or services including diagnostic measures, or had drugs or medicines prescribed or taken in the 3 months prior to the day You become insured under this Policy.

"Injury" and "Sickness" are defined as:

3

**Injury** means an accidental bodily injury which is the direct result of a sudden, unexpected and unintended external force or element, such as a blow or fall, that requires treatment by a Physician. It must be independent of Sickness or any other cause, including, but not limited to, complications from medical care. Disability due to such injury must begin while You are insured under the Policy. Injury does not include elective or cosmetic surgery or procedures, or complications resulting therefrom.

**Sickness** means a disease, disorder or condition, including pregnancy, for which you are under the care of a Physician. Disability must begin while you are insured under the Policy. Sickness does not include elective or cosmetic surgery procedures, or complications resulting therefrom.

As set out above, the Pre-existing Conditions Exclusion includes a "look-back period," by which an injury or sickness condition constitutes a pre-existing condition only if the injury or sickness was treated in the three months before Plaintiff's long-term disability coverage began on March 12, 2013. Thus, Plaintiff's look-back period ran from December 12, 2012 to March 12, 2013.

Long before becoming a real estate manager for Thornton's, Plaintiff hurt his back on October 16, 1998, in a slip and fall accident that fractured the spinous processes of Plaintiff's T6, T7, and T8 vertebrae in his thoracic spine. In laymen's terms, Plaintiff hurt the parts of his vertebrae that attach muscles and ligaments to his spine in the upper part of his back. Thanks to successful pain management and rehabilitation, Plaintiff was able to live a relatively pain free life for roughly the next fourteen years.

4

But being a real estate manager for Thornton's required Plaintiff to spend approximately fifteen to twenty hours a week driving to potential store locations. And a few months after he began his employment with Thornton's, Plaintiff began again experiencing back problems. Specifically, around September 2012, Plaintiff began suffering from back pain and "mid/lower back spasms" that he attributed to "driving too much." Plaintiff saw his physician Dr. Charles Gelia to have his back checked and was prescribed pain medications, including Vicodin.

On December 12, 2012, the look-back period for Plaintiff's long term disability policy began. Around the same time, one of Plaintiff's co-workers was fired and Plaintiff began regularly driving between forty and sixty hours a week. In January 2013, Plaintiff experienced a "sudden onset of sharp, stabbing pain over his mid back." On March 4, Plaintiff returned to Dr. Gelia to obtain prescription refills for Vicodin and Tramadol for pain in his "upper-mid back." On March 12, 2013, the look-back period for Plaintiff's long term disability policy ended.

As Plaintiff continued to spend most of his week driving, his back pain and muscle spasms became progressively worse. On April 23, 2013, Plaintiff returned to Dr. Gelia and again complained of back pain caused by his increased driving. By June and July, Plaintiff's back pain and muscle spasms were so severe that he was having difficulty walking, and pain medications no longer provided Plaintiff

5

enough relief to make it through the day.  His last day of work at Thornton's occurred **o**n August 2, 2013 and he claimed to be disabled as of August 3, 2013.

Plaintiff continued to seek treatment for his back after he had ceased working at Thornton's.  On August 23, 2013, Plaintiff saw Dr. Sunil Panchal. Plaintiff told Dr. Panchal that his pain began in February 2013 and became worse with increased driving.  Plaintiff also indicated to Dr. Panchal that his back pain originated specifically in his T6, T7, and T8 vertebrae, and that he had first experienced such pain on October 16, 1998—the day of his original fall.  After a physical examination, Dr. Panchal observed that Plaintiff's "mid back pain reproduced with thoracic facet loading," which "suggest[ed] the involvement of the lower thoracic and upper lumbar facet joints."

On September 12, 2013, Plaintiff obtained an MRI of his lumbar spine.  The next day Plaintiff saw Dr. Brody Henkel.  Plaintiff informed Dr. Henkel that he first hurt his T6, T7, and T8 vertebrae in 1998 and had a "history of mid back pain" as a result.  But Plaintiff indicated that he had remained relatively pain free until earlier in 2013.  Plaintiff also informed Dr. Henkel that he had been taking Vicodin and Tramadol for his pain.  In a physical examination of Plaintiff's lumbar spine, Dr. Henkel noted that Plaintiff had "Full, painless range of motion" and no observable problems.  Dr. Henkel also found the MRI of Plaintiff's lumbar spine to

6

be normal.  Dr. Henkel thus assessed Plaintiff as suffering from "pain in the thoracic spine" and recommended obtaining an MRI of his thoracic spine.

Two weeks later, at the end of September 2013, Plaintiff submitted a claim to Defendant for short term disability benefits.  Plaintiff claimed that he was disabled by severe back pain and muscle spasms.  He also indicated that his symptoms had begun in February 2013 and that he first treated them in February and March of that year.  Along with his claim, Plaintiff included a form with Dr. Gelia's assessment written on September 18th.  Dr. Gelia stated that Plaintiff had sciatica (pain that radiates along the sciatic nerve in the lower back and legs), muscle spasms, and pain in the thoracic spine.  Dr. Gelia also indicated that Plaintiff's symptoms first appeared on October 16, 1998, when Plaintiff fell.

While going through the process of obtaining approval for his short term disability benefits, Plaintiff emailed Defendant twice on December 2, 2013.  In the first email, Plaintiff asked Defendant to "go over [t]horacic spine injuries versus lumbar spine injuries" and stated that he had a "more rare [t]horacic]" injury that could be confirmed by his physicians.  In the second, Plaintiff asked for assistance obtaining a "thoracic MRI" that would allow Dr. Henkel to determine whether Plaintiff was suffering from a herniated disk or nerve damage "in the [t]horacic

spine." Two days later, Defendant notified Plaintiff that it was automatically transitioning his short term disability claim to a long term disability claim.

On December 17, 2013, Plaintiff had an MRI on his thoracic spine. Although the MRI noted that Plaintiff's clinical indication was "thoracic pain," the MRI itself showed no evidence of "any significant abnormality." Two days later, Plaintiff followed up again with Dr. Henkel. Dr. Henkel noted that Plaintiff continued to report "constant sharp stabbing pain over his mid back with no radiating pain to his neck or lower back." Dr. Henkel again checked Plaintiff's lumbar spine and found "no muscle spasms and normal range of motion." After reviewing the thoracic MRI, Dr. Henkel concluded that it was "normal," and he could not "identify an underlying Neurological etiology for [Plaintiff's] reported mid-back pain"—meaning he could not identify the cause of Plaintiff's pain. Nevertheless, Dr. Henkel assessed Plaintiff as suffering from "pain in the thoracic spine" and recommended Plaintiff follow up with a pain management specialist.

As Plaintiff waited for Defendant's decision on both his short and long term disability benefits, he continued to seek the opinion and assistance of more doctors. On February 2, 2014, Plaintiff saw Dr. David Kalin, who prepared a medical report to submit to Defendant. In preparing his report, Dr. Kalin reviewed Plaintiff's medical history and conducted a physical examination. Dr. Kalin's report

8

acknowledged that Plaintiff had previously fractured the spinous processes of the T6, T7, and T8 vertebrae in his back in 1998, but noted that he had been "asymptomatic" until September 2012 when he developed "mid/lower back spasms," sought treatment, and was prescribed Vicodin and Tramadol (among other medications).  From his physical examination, Dr. Kalin observed that Plaintiff's upper back had "palpable midline tenderness over thoracolumbar junction with mild rotation."  By comparison, Plaintiff's lower back was "without midline tenderness or spasm."  In his assessment, Dr. Kalin found that Plaintiff suffered from "Exacerbation/Aggravation [of a] chronic thoracolumbar musculoskeletal ligamentous strain with minimal annular bulging L4-5, L5-S1"— meaning that Plaintiff had exacerbated a chronic ligament strain in his thoracic or lumbar region and had two bulging discs in his lumbar spine.  Based on Plaintiff's "medical history, physical examination and review of available medical records/diagnostic studies, [Plaintiff's] present musculoskeletal [condition] was initially caused by a slip/fall injury sustained during 1998, with fractures of the spinous processes of T6-7-8."  Dr. Kalin ultimately concluded that "Within a reasonable degree of medical probability [Plaintiff's] employee obligations, requiring long hours of prolonged driving have exacerbated and/or aggravated his preexisting condition."

9

On February 7, 2014, Defendant denied Plaintiff short term disability benefits for everything but the period from August 10, 2013 to September 13, 2013.  Defendant found that there was no "clinical or diagnostic evidence" supporting Plaintiff's disability and therefore concluded that Plaintiff was not disabled.

On February 12, 2014, Plaintiff saw another doctor, Dr. Steven Barna. Plaintiff indicated to Dr. Barna that he was still suffering from "midback pain and low back pain."  Dr. Barna diagnosed Plaintiff with "thoracic spondylosis" (spinal degeneration).

Two weeks later, on February 26, 2014, Defendant denied Plaintiff's claim for long term disability benefits.  Defendant again concluded that there was insufficient evidence to establish that Plaintiff was disabled.  In addition, Defendant found that Plaintiff had previously been treated for back pain and muscle spasms through the prescription of Vicodin and Tramadol during the look-back period.  Hence, Defendant concluded that, even if Plaintiff was disabled, his claim would be barred by the Pre-existing Conditions Exclusion.

Plaintiff first appealed Defendant's denial of short term disability benefits. In July 2014, Plaintiff submitted a personal statement to Defendant describing the initial onset of his back pain and muscle spasms in January 2013, his progressively

10

worsening state that led to him stopping work in July 2013, his current condition (comprised of both back pain and muscle spasms in his "mid to lower back"), and his decreased quality of life. In addition, Plaintiff submitted a signed statement from Dr. Gelia. Dr. Gelia stated that he diagnosed Plaintiff with "pain in the thoracic spine, sciatica and hypermobility syndrome" caused or contributed to by the significant time Plaintiff spent driving for work. And, in Dr. Gelia's opinion, Plaintiff was incapable of working in his current condition. Nevertheless, in August 2014, Defendant denied Plaintiff's appeal for additional short term disability benefits beyond what had already been provided. Defendant again asserted that Plaintiff had not sufficiently established his disability.

A few days after Defendant denied Plaintiff's appeal for short term disability benefits, Plaintiff appealed the denial of his long term disability benefits. In regard to the applicability of the Pre-existing Conditions Exclusion, Plaintiff asserted that there was only a single instance of treatment in the look-back period and that the diagnosis listed by Dr. Gelia on that occasion, "BA," (presumed by Defendant to mean "back ache") was meaningless.

In February 2015, Plaintiff saw Dr. Robert Guirguis and underwent electromyography and nerve conduction velocity tests. Dr. Guirguis noted that Plaintiff complained of "low back pain radiating to the bilateral LE with numbness

and tingling in the bilateral foot." In addition, Dr. Guirguis opined that the tests provided evidence "consistent with lumbar radiculopathy affecting the bilateral L5 nerve roots" in Plaintiff's lumbar spine.

In March 2015, Dr. Gelia submitted a supplemental statement to Defendant. He asserted that Plaintiff's March 4, 2013 visit was for refilling prescription pain medications because Plaintiff was experiencing pain in his "upper mid-back." Dr. Gelia then stated that it was "clearly now apparent that the condition that disables [Plaintiff] is in the lumbar region and includes sciatica." Dr. Gelia also opined that, based on a recent MRI of Plaintiff's thoracic spine that showed only minimal protrusion of his T11 and T12 vertebrae, there was no support for a "thoracic-based disability." Dr. Gelia concluded that Plaintiff was unable to work "due to his extensive lumbar issues."

Plaintiff also obtained a supplemental report from Dr. Kalin in March 2015. Dr. Kalin's updated report largely copied the first, but included a few notable differences. First, in his physical examination of Plaintiff he now observed "palpable tenderness T12-L2" in Plaintiff's lower back in addition to the tenderness in his upper back. Second, Dr. Kalin changed his initial assessment. He found that Plaintiff now suffered from "Aggravation [of a] chronic thoracolumbar musculoskeletal ligamentous strain with mild central protrusion T1-

12

12 without canal stenosis or cord compression (02/11/15, MRI), mild osseous degenerative change with mild scoliosis (01/27/15, MRI), [and] minimal annular bulging L4-5, L5-S1 (09/12/13, MRI)." Dr. Kalin also added a new assessment for "Chronic right sciatica and bilateral lumbar radiculopathy with electrodiagnostic evidence consistent with lumbar radiculopathy affecting bilateral L5 nerve roots (02/12/15, EMG NCV bilateral lower extremities) with antalgic gait." Based on this, Dr. Kalin came to three conclusions. First, "Within a reasonable degree of medical certainty," Plaintiff's "preexisting condition due to fractures of the spinous processes of T6, 7, 8, slip and fall injury 1998" was aggravated by prolonged driving. Second, "Within a reasonable degree of medical certainty," the prolonged driving "caused additional compression extending from the thoracic to the lumbar spine, resulting in further decompensation of the musculoskeletal integrity in the mid/lower back" that resulted in Plaintiff's lumbar problems, including low back pain and sciatica. Finally, Dr. Kalin concluded that Plaintiff was disabled from working "due to the extensive decompensation of his lumbar spine."

Plaintiff submitted Dr. Kalin's supplemental report to Defendant in April 2015. In the attached letter, Plaintiff asked Defendant to "note the distinction between upper and lower thoracic issues," and asserted that the "March 4, 2013

13

office visit with Dr. Gelia addressed <u>upper</u> thoracic issues." (Emphasis in original.) Plaintiff also asserted that his lumbar radiculopathy could not be caused by a "thoracic bulge or other lesion."

Taking Plaintiff's medical documentation and history into consideration, Defendant's medical consultant Dr. Nancy Heimonen issued her opinion in May 2015. Dr. Heimonen found that Plaintiff's sciatica and lumbar diagnoses lacked "documented evidence" from when Plaintiff originally submitted his claim. In addition, the findings of other doctors from around the time of Plaintiff's initial disability claim were inconsistent with a lumbar issue. In particular, Dr. Heimonen noted that Plaintiff did not complain about lumbar problems or pain in 2013, that his 2013 lumbar MRI did not show any issues, and that both Dr. Henkel's and Dr. Panchal's physical examination findings were not consistent with lumbar problems. Hence Dr. Heimonen concluded that the sciatica and lumbar diagnoses were "new" problems and, if correct, had developed after Plaintiff filed his disability claim. Dr. Heimonen also found that there was as an "absence of documented evidence of neurological deficit, confirmed physical exam findings and/or imaging study results that support/explain the extent of [Plaintiff's] pain complaints," and therefore it was uncertain whether Plaintiff qualified as disabled. Addressing Plaintiff's pre-existing condition, Dr. Heimonen concluded there was

14

"reasonable medical evidence" to find that the symptoms Plaintiff was treated for during the look-back period were the same as those underlying his disability claim.

In July 2015, Defendant denied Plaintiff's long term disability benefits appeal on the grounds that Plaintiff's lumbar condition was a recent development and not part of his disability, that Plaintiff was not actually disabled, and that, even if disabled, the Pre-existing Conditions Exclusion applied because Plaintiff had received treatment during the look-back period by being prescribed Vicodin and Tramadol for back pain and muscle spasms.

In response, Plaintiff brought suit against Defendant under 29 U.S.C. § 1132(a)(1)(B) for the denial of both Plaintiff's short term and long term disability benefits claims. The parties mutually resolved the short term disability benefits claim. The parties also agreed that the only question to be decided by the district court was whether the Pre-existing Conditions Exclusion applied. If the court found that it did not, then the case would be remanded to Defendant to determine whether Plaintiff met the definition of total disability. After filing cross-motions for summary judgment on the issue, the district court found that the Pre-existing Conditions Exclusion applied and entered judgment in favor of Defendant. The district court based its ruling on two key facts. First, Plaintiff had obtained treatment and took medication for back pain during the look-back period when he

15

saw Dr. Gelia in March 2013. And second, both Dr. Heimonen and Dr. Kalin concluded that Plaintiff's complaints from the time he filed his disability claim were the same as his complaints during the look-back period for which he was treated.

Plaintiff then filed a motion under Rules 52(b) and 59(e) to "add or amend findings of fact or to alter or amend judgment" asserting that the district court's opinion should have recited an additional paragraph from Dr. Kalin's supplemental report. The district court found that Plaintiff's motion was merely an attempt to re-litigate the issues already decided on summary judgment and denied the motion. Plaintiff now appeals the district court's rulings on both summary judgment and Plaintiff's postjudgment motion.

## DISCUSSION

### I. Motion for Summary Judgment

#### A. Standard of Review

We "review a district court's grant of summary judgment in an ERISA case *de novo*, applying the same judicial standard to the administrator's decision that the district court used to guide its review." *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 673 (11th Cir. 2014) (citing *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 (11th Cir. 2011)). Although ERISA itself does not set a standard of

16

review for the review of an administrator's decision to deny benefits, we apply a multi-step framework crafted from the Supreme Court's guidance. *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354-55 (11th Cir. 2011).[1]  Because the parties agree that Defendant had no discretion to either determine benefits eligibility or construe the plan's terms, we need not leave the first step, and we "apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong.'"  *Id.* at 1355 (citing *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010)).  Finally, because Defendant has

---

[1]  The steps are:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1355.

17

denied Plaintiff's claim on the basis of the Pre-existing Conditions Exclusion, the burden is on the administrator to show that the "exclusion prevents coverage." *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam).

### B.    Back Pain and Muscle Spasms are not Pre-Existing Conditions under the Pre-Existing Conditions Exclusion

A condensed timeline is helpful before we begin our analysis. Plaintiff began his employment at Thornton's on March 12, 2012. He ceased working on August 2, 2013, and, in September 2013, he filed a claim for disability benefits with Defendant. But, as with most disability plans, Plaintiff was not covered for any disability that resulted from a pre-existing condition treated within a specified period of time, referred to as "the look-back period."

Plaintiff's look-back period began on December 12, 2012 and ended on March 12, 2013. In August and October 2012, Plaintiff was prescribed pain medications and gel to address his back pain. On December 28, 2012, Plaintiff obtained a refill of his pain medications to address his continuing pain. And, on March 4, 2013, he sought treatment and obtained refills for Vicodin and Tramadol, which had been previously prescribed to treat the pain in his upper-mid back (the thoracic region).

18

After the look-back period ended on March 12, 2013, Plaintiff's back problems persisted. On March 14, two days after the look-back period ended, Plaintiff refilled the pain medication prescriptions for his back pain. A month later, he saw Dr. Gelia, again complaining of back pain and muscle spasms. Plaintiff's back pain and muscle spasms became worse over the following months until, in early August, Plaintiff alleges that they were so severe that he was forced to quit his job. Shortly afterwards, in late August and September, Plaintiff saw a number of doctors looking for treatment. During these visits, Plaintiff told both Dr. Panchal and Dr. Henkel that he was suffering from pain seemingly identical to the pain he had previously experienced from fracturing the spinous processes in his T6, T7, and T8 vertebrae in 1998. Plaintiff also told Dr. Henkel that he had been taking Vicodin and Tramadol to treat the pain. An MRI of Plaintiff's lumbar spine showed no significant problems or abnormalities, so Dr. Henkel recommended obtaining an MRI of Plaintiff's thoracic spine.

At the end of September 2013, Plaintiff filed for disability benefits with Defendant and claimed to be disabled by his back pain and muscle spasms. Dr. Gelia's assessment, attached to his claim, stated that Plaintiff was suffering from sciatica, muscle spasms, and pain in the thoracic spine. Dr. Gelia also indicated that Plaintiff's symptoms had first appeared in 1998 after his fall.

19

Later, in December 2013, Plaintiff continued to try and obtain a thoracic MRI as Dr. Henkel had recommended and asked Defendant for help. He told Defendant that he needed the thoracic MRI because he had a "[t]horacic" injury and the MRI was necessary to diagnose the underlying cause. Shortly afterwards, Plaintiff underwent a thoracic MRI which, like his earlier lumbar MRI, showed no significant abnormalities. As a result, Dr. Henkel diagnosed Plaintiff with "pain the thoracic spine" and recommended pain management.

But Plaintiff continued to seek other opinions. In February 2014, Plaintiff saw Dr. Kalin, who concluded Plaintiff's back problems were initially caused by his fall in 1998 and were exacerbated by his driving for Thornton's. Also in February, Plaintiff saw Dr. Barna who diagnosed Plaintiff with thoracic spondylosis. Despite this, Defendant denied Plaintiff's claim for long term disability benefits on the grounds that he was not disabled and, if he was disabled, that his disability was the result of a pre-existing condition treated during the look-back period.

A year later—nearly a year and half after Plaintiff initially claimed to be disabled—Plaintiff saw Dr. Guirguis for electromyography and nerve conduction velocity testing. Based on the test results, Dr. Guirguis concluded that Plaintiff was suffering from lumbar radiculopathy. Upon seeing these results, both Dr.

20

Gelia and Dr. Kalin revised their initial assessments and asserted that Plaintiff's disability was a result of lumbar radiculopathy and other lower-back issues.

Defendant's medical consultant, Dr. Heimonen, reviewed Plaintiff's medical history and reached a number of conclusions. Specifically, she found that any lumbar-based disability was "new" and did not exist at the time Plaintiff left his job and filed for disability. She also concluded that it was uncertain whether Plaintiff was actually disabled. And, finally, Dr. Heimonen found that there was reasonable medical evidence to believe that Plaintiff had been treated during the look-back period for the same symptoms he later filed disability for—meaning that his disability was pre-existing. Defendant denied Plaintiff disability benefits for a second time on these same grounds, asserting that he was either not disabled or that the Pre-Existing Conditions Exclusion applied.

Altogether, Defendant twice denied Plaintiff long term disability benefits based on the Pre-existing Conditions Exclusion because Plaintiff received treatment for "back pain and muscle spasms" during the look-back period—the same symptoms that Plaintiff ultimately claimed, just a few months later, to be so debilitating as to render him disabled and unable to work. In doing so, Defendant relied on the fact that Plaintiff was prescribed, and refilled prescriptions for, Vicodin and Tramadol for back pain during the look-back period in March 2013.

21

In its ruling for Defendant, the district court agreed and found that Plaintiff "treated with his primary care physician before, during, and after the look-back period for back pain, and had prescriptions for pain medicine filled during the look-back period."

But back pain and muscle spasms are not by themselves necessarily Pre-Existing Conditions under the Exclusion.  To interpret the plan and the Pre-existing Conditions Exclusion, we look first to the plan's text, and we give the plan's terms their plain and ordinary meaning.  *See Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1307 (11th Cir. 2016).  The Exclusion states that Defendant "will not provide benefits for Disability:  (a) caused by, contributed to by, or resulting from a Pre-existing Condition; and (b) which begins in the first 12 months after [the policyholder is] continuously insured under this Policy."  The record shows, and the parties do not dispute, that (b) is satisfied.[2]  The only question then is whether Plaintiff had a Pre-existing Condition that caused, contributed to, or resulted in his disability.

The policy defines "Pre-existing Condition" as "any Injury or Sickness for which [the policyholder] received medical treatment, advice or consultation, care

---

[2]  Plaintiff first became insured under the policy when he was hired on March 12, 2013, and Plaintiff states his disability began within a year.

or services including diagnostic measures, or had drugs or medicines prescribed or taken in the 3 months prior to the day [the policyholder] became insured under this Policy." In turn, "Injury" is an "accidental bodily injury," and "Sickness" is "a disease, disorder or condition." Stitching these definitions together, a Pre-existing Condition must be an accidental bodily injury, a disease, a disorder, or a condition.

Back pain and muscle spasms are not by themselves an accidental bodily injury, a disease, a disorder, nor a condition. Back pain and muscle spasms are the symptom for which an accidental bodily injury, a disease, a disorder, or a condition might be the cause. At no point in Defendant's denial letters or in its brief does Defendant assert that back pain and muscle spasms are, in and of themselves, an accidental bodily injury, a disease, or a disorder.

At most, Defendant occasionally refers to Plaintiff's "disabling condition" as back pain and muscle spasms. But the plain text of the plan expressly defines pain as being a "symptom," not a "condition." The plan defines "Self-Reported Symptoms," in part, as "*manifestations of* [*the policyholder's*] *condition*." (Emphasis added.) And "Examples of Self-Reported Symptoms include, but are not limited to headaches, *pain*, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness, and loss of energy." (Emphasis added.) So pain is the

23

"manifestation," or symptom, of a condition; it is not a condition itself. Under the plan's plain text, Plaintiff's back pain is a symptom, not a condition.

And this same logic dictates that muscle spasms cannot by themselves constitute a Pre-existing Condition. Muscle spasms are, like pain, soreness, or stiffness, a symptom of some underlying injury, disease, disorder, or condition.[3] Muscle spasms are not a condition, nor are they an accidental bodily injury, a disease, or a disorder. Because a Pre-existing Condition must be either an accidental bodily injury, a disease, a disorder, or a condition, the Pre-existing Conditions Exclusion cannot apply to Plaintiff's back pain and muscle spasms.

## C.    Genuine Issues of Material Fact Preclude Summary Judgment

That said, though, the underlying cause of Plaintiff's back pain and muscle spasms could constitute an accidental bodily injury, disease, disorder, or condition that would potentially trigger the Pre-Existing Conditions Exclusion. The record, however, is rife with inconsistencies and contradictory evidence that preclude entering summary judgment for either party. Ultimately, to determine whether the Exclusion applies, at least three facts are essential:  (1) what Plaintiff's disability

---

[3]  *Cf. Gagliardo v. Connaught Lab., Inc.*, 311 F.3d 565, 567 (3d Cir. 2002) (describing "muscle spasms" as a "symptom"); *Smith v. Kmart Corp.*, 177 F.3d 19, 23 (1st Cir. 1999) (same); *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (same); *Preston v. Sec'y of Health and Human Serv.*, 854 F.2d 815, 817 (6th Cir. 1988) (same); *Smith v. Office of Pers. Mgmt.*, 784 F.2d 397, 398 (Fed. Cir. 1986) (same); *Taylor v. Heckler*, 742 F.2d 253, 256 (5th Cir. 1984) (same).

24

is, (2) what Plaintiff's Pre-Existing Condition is, and (3) what, if any, relationship there is between Plaintiff's Pre-Existing Condition and his disability.  But the record contains conflicting and inconsistent evidence that makes resolution of these factual issues inappropriate for summary judgment.

For example, it cannot be determined whether Plaintiff had a Pre-Existing Condition that caused, contributed to, or resulted in his disability without first establishing what Plaintiff's disability is.  In spite of this, the parties have— through stipulations governing how they would like this litigation to proceed— attempted to put the cart before the horse by limiting the sole issue before the district court to whether or not the Pre-Existing Conditions Exclusion applied and reserving a possible disability determination for later.  Yet the parties themselves acknowledge that a ruling on the Pre-Existing Conditions Exclusion necessitates first establishing what Plaintiff's disability is, demonstrated by the fact that both spend the majority of their briefs arguing about whether Plaintiff's disability is caused by a lumbar or thoracic condition.

And on this very confusing record, the issue of Plaintiff's disability does not lend itself to disposition on summary judgment.  The record seems to indicate the existence of a thoracic condition when Plaintiff's complaints first began, based on Plaintiff's self-described symptoms, his initial claims and statements to Defendant,

25

and the notes from the doctors he initially visited in August and September 2013. Yet Dr. Henkel reviewed an MRI of Plaintiff's thoracic spine and concluded in December 2013 that, in fact, there were no significant abnormalities. Nevertheless, two months later, in February 2014, Dr. Barna diagnosed Plaintiff with thoracic spondylosis, and Dr. Kalin concluded that Plaintiff's disability was an exacerbation of his 1998 thoracic injury. So, there is conflicting evidence not only as to whether Plaintiff had a thoracic condition, but whether even such a condition constitutes a disability.

And there is also evidence that suggests Plaintiff may have at a later time developed a lumbar condition. Testing in February 2015 showed that Plaintiff was suffering from lumbar radiculopathy. Upon reviewing these test results, Dr. Kalin then revised his initial diagnosis to conclude that Plaintiff's disability was now primarily lumbar-based (though he still indicates there is some connection between the lumbar disability and Plaintiff's earlier thoracic injury).

However, even if Plaintiff is currently disabled because of a lumbar condition, it will also be necessary to determine *when* that disability arose, which is yet another issue with conflicting evidence. Plaintiff's disability coverage presumably ended when he left Thornton's employ on August 2, 2013, so presumably Plaintiff must establish that his lumbar disability began no later than

26

that date to be entitled to disability benefits.  But the doctors' notes and lumbar MRI from September 2013 suggest that there were no significant problems in Plaintiff's lumbar spine.  Indeed, aside from Dr. Gelia's statements that Plaintiff had sciatica, the record lacks documentation of any significant lumbar problems until Plaintiff's February 2015 lumbar MRI—roughly a year and a half after we assume his disability policy to have ended.

Perhaps Plaintiff can thread the eye of this needle and demonstrate (1) that he was disabled by a lumbar condition (2) that arose before his insurance policy ended and (3) that was not caused by an earlier thoracic injury that manifested itself during the look-back period.  But that determination cannot be made on this record via a summary judgment motion.

And this discussion only broaches the issue of Plaintiff's disability.  Once that has been determined, it will then be necessary to establish what accidental bodily injury, disease, disorder or condition Plaintiff was treated for during the look-back period, and, whether that ailment caused, contributed to, or resulted in Plaintiff's disability.  There are genuine issues of material fact on these issues as well.

Put simply, in light of the genuine issues of material fact that abound in this case, summary judgment is an inappropriate mechanism to determine what

Plaintiff's disability is and whether the Pre-Existing Conditions Exclusion applies. Therefore, on this record, we cannot approve the grant of summary judgment to either party. Thus, we remand for further proceedings.

## II.    Motion to Amend or Alter Findings of Fact or Judgment

Because we hold that the district court erred by entering judgment in favor of Defendant, Plaintiff's motion to amend or alter findings of fact or judgment is moot.

## CONCLUSION

The district court's order granting summary judgment in favor of Defendant is **REVERSED**, the denial of Plaintiff's motion for summary judgment is **AFFIRMED**, and the motion to alter or amend findings of fact or judgment is **DENIED AS MOOT**. The case is **REMANDED** to the district court for further proceedings consistent with this opinion.

28